THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
VICTOR GASKINS, Defendant-Appellant.

First District (5th Division)   No. 78-1361

Opinion filed February 29, 1980.

38

James J. Doherty, Public Defender, of Chicago (Ira Churgin, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Myra J. Brown, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant was indicted for murder, armed robbery, aggravated kidnapping and theft in the disappearance and death of Taweeyos

Sirikul. (Ill. Rev. Stat. 1975, ch. 38, pars. 9—1, 18—2, 10—2(a)(3) and 16—1(a)(1).) The trial court allowed the State's *nolle prosequi* motion on the theft charge and the remaining charges were tried before a jury. At the close of the evidence, the court directed verdicts for defendant on the aggravated kidnapping charge and on the felony-murder count related to the aggravated kidnapping charge. The remaining murder counts and the armed robbery charge were submitted to the jury which found defendant guilty of both offenses. Judgment was entered on the verdicts and a presentencing investigation was ordered. After a hearing, the court sentenced defendant to concurrent terms of 20 to 60 years for the armed robbery and 150 to 300 years for the murder.

On appeal, defendant contends that: (1) the jury instructions for armed robbery and murder were improper; (2) the State failed to prove the victim's identity beyond a reasonable doubt; (3) the trial court improperly excluded evidence which was probative of the defense theory; (4) the State's rebuttal argument deprived defendant of a fair trial; and (5) the trial court abused its discretion in sentencing defendant. We affirm.

In the course of the trial, the State called 13 witnesses and offered and had received in evidence 47 exhibits. Defendant did not testify. His case consisted of 11 exhibits, 5 of which were admitted in evidence, and the testimony of 2 witnesses. A summary of the pertinent evidence adduced at trial follows.

In February 1977, Taweeyos Sirikul lived with his fiancee, Busaba Burakasikorn, at 5815 North Sheridan Road in Chicago. The two had come to the United States from Thailand to pursue graduate degrees at Roosevelt University. Ms. Burakasikorn knew Sirikul's family in Thailand, where Sirikul's father had what she believed to be a supervisory position with the police in Bangkok. Two of the brothers of Sirikul's father also worked for the government, one as a policeman, the other in the military. Ms. Burakasikorn was registered with the Department of Immigration and had a student visa. She had received her degree and was working at a nursing home near their apartment and Sirikul was working from 3 p.m. to midnight while finishing his studies.

Sirikul owned two cars at the time, a red 1976 Trans Am and an older Chevrolet. Sirikul put his Trans Am up for sale, placing an ad in the Chicago Sun Times on February 21, 1977. The ad described the car, listed Sirikul's phone number, and indicated that interested persons should call before 2 p.m.

On February 25, 1977, Ms. Burakasikorn received a phone call around 1 p.m. from a man who was interested in buying the Trans Am. They arranged for him to come over the following day, a Saturday, when he and Sirikul took the car for a test drive. Ms. Burakasikorn identified the

man as defendant. After test driving the car, defendant borrowed $1 from Sirikul and left. On Tuesday, March 1, 1977, defendant again came by to see the car, this time borrowing $3 from Sirikul and leaving his watch as security. Defendant was to repay the money on Thursday, March 3, 1977, but when he hadn't arrived by 2 p.m., Sirikul left. At 2:30 p.m. the phone rang, but no one was there when Ms. Burakasikorn answered it. A few minutes later defendant knocked at the door and asked if Sirikul was there. Ms. Burakasikorn told him to come back the following day. At about 3 p.m. defendant returned to the door and asked if Sirikul had left the watch for him. Early the following morning, March 4, 1977, Ms. Burakasikorn and Sirikul were at home together when the phone rang. Sirikul answered and told Ms. Burakasikorn it was the same man who had test driven the car. Sirikul left the apartment shortly before 9 a.m., wearing a leather jacket that matched one he had given Ms. Burakasikorn. It was the last time Ms. Burakasikorn saw him alive.

Ms. Burakasikorn worked from 9:30 a.m. to 12:30 p.m. on March 4, 1977, and Sirikul was not at home when she returned although they had planned to go shopping. She later called his employer and discovered that Sirikul had not arrived at work that day. Ms. Burakasikorn first called the police around 8 p.m. When her report that her boyfriend was missing was met with the response that he was fooling around with another woman, Ms. Burakasikorn called the police a second time, identifying herself as Sirikul's wife. She described the man who had come to the apartment and said that he gave his name as Brian, that he worked at a Jack-in-the-Box restaurant and that he carried a briefcase.

Defendant did not go to school on March 4, 1977. At about 5 p.m. that day, he drove to the home of Lindsay James, one of his high school friends, arriving in a 1975 or 1976 red Trans Am which James had never seen before. Another friend, Roosevelt Jones, had been visiting James, and defendant drove the two of them to Alden Park in the Trans Am. Defendant and James eventually drove to Evergreen Plaza shopping center, where defendant gave James Sirikul's paycheck, driver's license and Social Security card. Defendant told James to cash the check and they would split the money from it, asking James to endorse the check because he fit the description on Sirikul's driver's license better than defendant. James went into a currency exchange and, with defendant standing a bit behind him, signed Sirikul's name and cashed the check. James received approximately $120 and gave $50 or $60 to defendant. The two returned to James' house and defendant left in the Trans Am around 9 p.m.

Ulysses Terhune, another of defendant's friends, saw defendant around 8:30 or 9 p.m. on March 4, 1977, when defendant drove up to Terhune's home in a 1976 red Trans Am which Terhune had never seen

before. Defendant and Terhune went to a nearby park where defendant let Terhune drive the Trans Am.

Terhune saw defendant in the same Trans Am around 10:15 a.m. the following day, March 5, 1977. Defendant's girlfriend was also in the car and they stayed at Terhune's until about noon. Defendant picked up Lindsay James at James' house around noon and they drove the Trans Am to Evergreen Plaza, where they bought some clothes. They paid for their purchases with a personal check that James signed in Sirikul's name, using Sirikul's driver's license as identification. Later in the day, defendant drove the Trans Am to Terhune's house and the two drove over to the home of Brian Rogers. Terhune, in the back seat en route to another friend's house, noticed what he thought to be blood splattered on the back window. Defendant and James drove to the automobile show the same day.

On March 6, 1977, Sirikul's family employed a private investigation firm, Beaton and Associates, to investigate Sirikul's disappearance. William Beaton, the owner, was the personal investigator of Dr. Robert Stein, the chief medical examiner of Cook County. The investigation was conducted by Frank Klee who, prior to joining Beaton, was a counterintelligence agent for the United States Army for four years and still served as a reserve criminal investigator for the United States Air Force. Klee interviewed Sirikul's two uncles, Ms. Burakasikorn, one of Sirikul's co-workers and persons in Sirikul's neighborhood. Klee's investigation of Sirikul's disappearance had nothing to do with his work for the Air Force or Army.

James, Terhune and other friends of defendant had also seen defendant driving the Trans Am during the next two weeks. James rode home from school in the car nearly every day. Homer McCoy, who said he was defendant's best friend, saw defendant frequently during the school week of March 7 to 11, 1977. He knew defendant planned to get a Trans Am on March 4, 1977, and defendant had driven McCoy and his sister to and from school in the car during the week that followed. McCoy had asked defendant to open the trunk of the car so that he could see how big it was and put his books inside, but defendant never opened the trunk for him. During the week of March 7 to 11, McCoy had also noticed that defendant burned incense in the car and kept a can of air freshener in the back seat. Once, the incense was so strong that McCoy had to open the window of the Trans Am for fresh air.

On March 9, 1977, Terhune and Rogers were standing about two feet from the trunk of the car when Terhune noticed a smell "like some kind of dead matter." On March 12, 1977, defendant picked Rogers up at home after meeting Terhune at his home. Terhune drove his own car while defendant drove the Trans Am. They went into the alley behind Rogers'

house where Terhune took the back tires off the Trans Am and replaced them with "mag" wheels. Terhune used his own jack because defendant would not let him open the trunk of the Trans Am to get the jack from there. While he was changing the tires, Terhune again noticed the smell emanating from the trunk. After changing the tires, Terhune drove the Trans Am around the block and heard a muffled thumping sound in the trunk whenever he quickly drove around a corner, came to a bump or stopped the car. Joseph Barbee, another friend and classmate of defendant, was also present that night and heard a flat, thudding sound coming from the trunk whenever they hit a bump as defendant drove him home in the Trans Am.

Some time during the week of March 7 to 11, 1977, Barbee was sitting in the 1976 red Trans Am in the school parking lot with defendant and another friend. Defendant left the keys in the ignition and entered the school. By the time defendant returned, Barbee and the other young man had taken the keys out of the ignition and locked the car so they could go into school. They began to tease defendant by playing with the keys but defendant became furious when they put the keys into the trunk lock.

In the morning of March 15, 1977, Terhune saw defendant at Hales Franciscan High School, the school they attended. Defendant was putting a CB antenna on the Trans Am. The trunk was open and Terhune could see a spare tire, a jack, a lug wrench and a can of clothes freshener. Terhune and defendant took the Trans Am to traffic court and Terhune paid a traffic fine. They then returned to school. McCoy also saw defendant at the school as defendant was connecting a CB radio in the Trans Am, although McCoy wasn't sure if it was March 14 or 15, 1977. The trunk was open, but McCoy did not look inside. That same evening, Terhune, defendant and three others rode in the Trans Am but Ternhune no longer noticed the odor he had smelled previously. As they rode along the expressway, they were stopped by the police. Defendant did not pull over immediately and appeared to be nervous and tense when he noticed the officer behind him.

In the evening of March 17, 1977, Terhune met defendant at 71st and Carpenter. Defendant drove up in the Trans Am, which no longer had a rear window. They drove to Terhune's house, parking the Trans Am in back of the house, and defendant took some articles out of the car, including the car's foreign-made radio-cassette tape player. In taking out the radio defendant tore out the bottom of the dashboard. Defendant also took a jacket, with Sirikul's Social Security card in it, out of the Trans Am. He put all of the articles into Terhune's car and parked the Trans Am in front of Terhune's house. Terhune then drove defendant home to 5212½ South Drexel. As they entered defendant's lobby, Terhune noticed the same odor he had smelled near the trunk of the Trans Am before March

15. The Trans Am stayed in front of Terhune's house until March 19, 1977, when Terhune parked it in his aunt's garage. Defendant moved the car to a vacant lot on March 23, 1977. On March 19, 1977, Terhune and defendant took public transportation to 5815 North Sheridan Road at about 8 a.m. The two entered the building, and defendant picked up the security phone and began talking.

Terhune knew defendant to use the name "Brian Wilson" and also testified that defendant had once drawn a knife in the course of an argument they had. James knew defendant to carry a briefcase with a knife inside and Barbee had seen defendant with a knife 15 to 20 times. According to Barbee, defendant carried his knife in his pocket and had drawn it on Barbee in anger.

Robert Holmes was the janitor for the U-shaped apartment complex at 5210 to 5218 South Drexel which included defendant's apartment at 5212½ South Drexel. The basements to the 14 buildings in the complex were abandoned and all had doors with locks, which frequently broke and needed replacement. The basement to the 5212½ building was accessible only through a corridor off the back alley and could not be seen either from Drexel or the alley. Holmes occasionally stored things in the basement at 5212½ and had a fold-away bed and a desk there on March 14, 1977. On March 14, Holmes and three others had been in the basement, entering after Holmes unlocked the Yale brand lock on the door. He noticed nothing unusual in the basement that day and locked the door as everyone left the basement.

The following day, Holmes noticed an unusual odor coming from the basement. There was a new lock on the door but he did not have a key and didn't know whose lock it was. On March 19, 1977, Holmes noticed a "rotten, bad odor" when he entered the 5212½ building. He checked the two vacant apartments in the building, removed some garbage from a rear porch and, still smelling the odor, looked into the basement window to see if some sewage had backed up. He saw the shadow of a figure lying on the basement floor, asked some workers to take a look, and called the police when they concluded that there was a body on the floor.

Officer Stanley Zablocki of the Chicago Police Department was the first police officer to arrive at the building. Zablocki and his partner arrived at about 10:15 a.m. and were directed to the basement by Holmes. Another officer arrived and conversed with Zablocki and Holmes, after which they looked into the basement window and saw a body inside. The basement door had a padlock on it and neither Holmes nor the officers had a key. After receiving authorization from a superior, Zablocki cut the lock with his bolt cutters. Zablocki gave the lock, a German-made "Abus" brand lock, to Officer Robert Okon who was also at the scene. Okon later inventoried the lock.

According to Zablocki, there was a strong odor upon opening the door after removing the lock. The police officers entered the basement and saw an uncovered, clothed male body lying in the front in an open area about 20 feet to the right of the entrance. Zablocki notified the department and other officers, homicide investigators, mobile unit evidence technicians, and the medical examiner's investigator arrived.

Investigator Frank Laverty went to the scene with his partner, John Janda, and entered the basement. In walking through the basement to the back wall where the body was, he noticed drag marks in the accumulation of cement dust on the floor. The body was fully clothed and was lying face down on the floor with one arm beneath the face. There were two brown electrical cords around one wrist. The victim's jacket was pulled up around his shoulders, revealing a blue and pink striped shirt. The victim also wore brown slacks, a belt and socks, but no shoes. Laverty was unable to detect the victim's race or age at the time and awaited the arrival of the mobile unit of the police crime laboratory.

Officer Alfred Klaser, an evidence technician assigned to the mobile crime laboratory, arrived at the scene with his partner, James Dunbar, at approximately 11 a.m. Klaser photographed the scene and unsuccessfully searched the basement for physical evidence. He also dusted some bottles for fingerprints. He saw no blood or liquid in the drag marks which led from the stairs to the body. The body was turned over after Klaser finished taking pictures. Klaser stated that the face was badly decomposed and he could not tell the race of the victim.

Investigator Laverty was still present when the body was turned over. He examined the victim's hands, chest and face, and stated that the victim's face appeared to be compressed. Large amounts of what Laverty believed to be body fluids were found around the face and in the chest area.

Myron D. Weigle was a medical investigator for the Cook County medical examiner's office. He was sent to 5212½ South Drexel to conduct the medical examiner's investigation, which had been assigned case number "573 March 1977." He took some Polaroid pictures of the scene and the body, noting on the pictures at the time that the victim was a male Negro. Weigle believed the victim to be Negro because his complexion appeared to be dark in the pictures Weigle took and the body was found in a black neighborhood.

After all photographs were taken at the scene, Officer Zablocki and his partner transported the body first to Michael Reese Hospital, where it was officially pronounced dead on arrival, and then to the Cook County morgue.

On March 20, 1977, Officer Klaser and Officer James Biggers went to the county morgue to attempt to fingerprint the victim after taking

additional photographs of the body. Three fingers of the right hand were found to be possible sources of fingerprints but the remaining fingers were too badly decomposed to try to take prints of them. Klaser sent the fingerprint card with the three prints to the identification section, but the results of the fingerprint examination were not known.

The autopsy was begun on March 20, 1977, by Dr. Tae An, a forensic pathologist employed by the medical examiner. Dr. An performed an external examination of the body and found the body to be moderately decomposed. The skin had areas of a greenish discoloration, with the rest of the skin appearing to be white. A large area of skin was peeling off the body due to decomposition. In performing the external examination, Dr. An was primarily concerned with finding signs of trauma. He did not observe any unusual marks, scars or deformities on the body and therefore did not write any down on his report. Dr. An noted that the eyes were protruding and there was a stab wound in the right chest. He also noted a leather cord tied around the right wrist and a stab defect in the victim's shirt.

The internal examination disclosed that the stab wound was about 3.6 inches deep and had cut through the liver, the inferior vena cava and the diaphragm, and had gone into the chest cavity. The stab wound was the cause of death, Dr. An concluded. He found no pathological lesion to the head.

Dr. An was unable to make a precise determination of the victim's race because decomposition makes such a determination difficult. It is especially difficult to distinguish among whites, Orientals and Latins once decomposition has begun, and he usually confines his classification in such cases to the broader categories of black and white. He therefore classified the body in case number 573 March 1977 as white. Dr. An also had no opinion as to exactly when the body met its death because the rate of decomposition is affected by many factors. He did speculate, however, that the body had probably been dead for a few weeks as opposed to a few days or months.

After Dr. An completed his examination of the body, he took blood, bile and liver specimens and sent them to the toxicology department for analysis for alcohol, tranquilizers and narcotics. The tests showed no tranquilizers or narcotics in the body, but the blood contained 172 milligrams percent ethanol, which exceeds the 100 milligram level which is considered legal intoxication in Illinois. He explained that gas is created during decomposition and leads to the formation of ethanol in the blood. Dr. An stated that concentrations of 100 to 200 milligrams percent ethanol in the blood can be found in decomposed bodies without necessarily meaning that the deceased had been drinking.

On March 23, 1977, Ms. Burakasikorn went to the Cook County

morgue where she met Investigator Patrick J. Seary. Ms. Burakasikorn was first shown some clothing taken from the body and identified it as being similar to clothing worn by Sirikul the last time she saw him. She looked at the left arm and, seeing a mole, identified the body as Sirikul. Ms. Burakasikorn had an identical mole on her right arm, and the two had occasionally talked about their identical moles. The rest of the body was covered but Ms. Burakasikorn was convinced that it was Sirikul. She became faint and did not look at the body any further.

Leonard Friel, an embalmer and funeral director, picked up Sirikul's body at the morgue on March 24, 1977. The body was identified both by Sirikul's name and by case number. Sirikul's body was placed in a metal casket that is specially sealed for the transportation of decomposing bodies. Friel also picked up a bag with clothing in it, including Sirikul's brown jacket. Some friends or relatives of Sirikul were at the morgue and preceded Friel to the Sottile Funeral Home, where the body was partially embalmed. John Shear, the undertaker, arranged the funeral. Due to the state of decomposition, an open casket was not used, but Friel and Shear did open the casket so that four or five friends or relatives of Sirikul could view the body.

Atchada Kesornsook, a long-time friend of Sirikul, viewed Sirikul's body at the funeral home on March 24, 1977. Kesornsook had known Sirikul for 15 years. The two had gone to school together and had lived together for a while after Kesornsook came to Chicago. He and his wife lived in the same building as Sirikul and Ms. Burakasikorn. Kesornsook and Sirikul worked at the same place. The last time Kesornsook had seen Sirikul alive was on March 3, 1977, in the mid-afternoon, and he learned of Sirikul's disappearance the following day.

Kesornsook looked at Sirikul's body twice at the funeral home, about three or four minutes the first time and five minutes the second time. The first time he looked at the body he saw only the upper half, but was unable to recognize the partially decomposed face. He identified Sirikul then on the basis of his body build. Kesornsook went back a second time to be sure of the identification, looking for and finding a pencil mark on Sirikul's right arm and a scar on his right forefinger. The pencil mark was the result of a pencil stab wound that Sirikul had received as a young boy while playing with his brother.

Following a Buddhist funeral ceremony that was attended by several people, Sirikul's body was taken to Graceland Cemetery for cremation.

On the night of March 24, 1977, defendant's aunt, Doris Bedney, brought him to the police station where defendant met investigators Seary and Janda, who talked to defendant. Ms. Bedney gave the investigators a General Motors payment book and automobile title to two cars, a Chevrolet Impala and a 1976 Trans Am. All were in Sirikul's name.

The investigators obtained written consent from Ms. Bedney to search defendant's bedroom.

On March 25, 1977, Seary, two other investigators and an assistant state's attorney went to defendant's first floor apartment at 5212½ South Drexel and were taken to defendant's bedroom by Ms. Bedney. Seary entered the bedroom and found certain property, which he inventoried. The items discovered included the Sun Times want ad for the sale of Sirikul's Trans Am; Sirikul's driver's license; a road map of Chicago; Bank of Chicago savings deposit slips in Sirikul's name; an insurance reminder notice from Allstate to Sirikul; General Motors ignition and trunk key; two keys to an "Abus" padlock; Sirikul's wallet containing his Roosevelt University student identification card; Sirikul's house keys; an imported AM-FM car radio; and a white jacket with brown and black markings with a Trans Am patch on it. Seary did not recover a knife or briefcase in defendant's room at that time and did not recall sending anyone back to look for them.

On March 25, 1977, Ms. Burakasikorn viewed two lineups at the police station and identified defendant as the man who had come to her and Sirikul's apartment on February 25 and 26 and March 1 and 3, 1977.

Also on March 25, 1977, Officer James Biggers of the police department crime laboratory examined the contents of the 1976 red Trans Am that was owned by Sirikul and had been driven by defendant. The car was at a police auto pound. Officer Biggers examined only the trunk. He removed a piece of black cardboard with insulation and a license plate envelope, which he inventoried and sent to the laboratory for analysis. He and his partner also dusted the inside of the trunk lid and the fender wells for fingerprints but found no prints suitable for comparison.

Bernadette Kwak, a microanalyst in the police crime laboratory, had run the tests on the blood samples sent to the lab by Dr. An. The blood was Type O. Ms. Kwak also tested the reddish-brown stains found on the black cardboard surface that Officer Biggers had sent to the lab from the Trans Am. The reddish-brown stain was Type O blood. She ran the same tests on similar stains found on the license plate envelope, on a black wallet recovered from defendant and containing three house keys, and on Sirikul's identification card and found all the stains to be Type O blood. Type O is found in about 43 to 45 percent of all human beings. Ms. Kwak also did laboratory comparisons on some hair samples sent from the morgue in the same case and on hair samples recovered from the black cardboard material from the Trans Am. The sample from the morgue was brown and dark brown, and ovoid in shape. The hair on the cardboard was reddish brown and dark brown. The black adhesive tape section of broken electrical cord had one dark brown and two brown hairs. No dark black hair was found.

Around March 25, 1977, Lindsay James gave the police a watch he had borrowed from defendant. The watch was identified at trial by James and defendant's friend, Joseph Barbee. It was also identified by Ms. Burakasikorn as the watch given Sirikul by the man who came to test drive the Trans Am. Kesornsook identified the same watch as the one Sirikul had shortly before he disappeared. Ulysses Terhune found defendant's jacket with Sirikul's Social Security card in his car sometime in June 1977 and gave them to the police.

Following the admission of exhibits, both parties rested and the defense motion for a directed verdict on the aggravated kidnapping and related counts was granted. Closing arguments were held after a conference on jury instructions.

The jury returned verdicts of guilty for armed robbery and murder and judgment was entered on the verdicts. A presentence investigation was conducted and, after a hearing on the matter, defendant was sentenced to 20 to 60 years for armed robbery and 150 to 300 years for murder. The sentences are to run concurrently. Defendant brought this appeal after the imposition of sentence.

OPINION

I.

Defendant first contends that the trial court erred in giving the jury the following instruction, a form of Illinois Pattern Jury Instructions, Criminal, No. 13.21 (1968) (hereinafter cited as IPI Criminal):

> "If you find that the defendant had exclusive possession of recently stolen property, and there was no reasonable explanation of his possession, you may infer that the defendant obtained possession of the property by Armed Robbery."

Defendant maintains that there was no direct evidence proving an armed robbery had occurred and that the jury was thus led to believe that it could convict defendant of armed robbery solely on the basis of unexplained possession of stolen property rather than drawing an inference from all of the evidence.

■■ It is neither necessary nor possible for a single instruction to state all of the law applicable to a particular case, and instructions must therefore be considered as a whole. (*People v. Porter* (1957), 11 Ill. 2d 285, 143 N.E.2d 250; *People v. Hubbs* (1948), 401 Ill. 613, 83 N.E.2d 289.) "It is sufficient if the series of instructions, construed as a whole, fully and fairly announced the law applicable to the theories of the defendant." *People v. Turner* (1967), 82 Ill. App. 2d 10, 27, 226 N.E.2d 667, 675.

The jury was first instructed that it must consider all of the instructions and that it may not single out certain ones. Furthermore, in

addition to the instruction which defendant challenges, the jury received the following instructions pertaining to armed robbery:

"A person commits the crime of armed robbery who, while armed with a dangerous weapon, takes property from the person or presence of another by the use of force or by threatening the imminent use of force." (IPI Criminal 14.01.)

"To sustain the charge of armed robbery, the State must prove the following propositions:

*First*: That the defendant took property from the person or presence of Taweeyos Sirikul; and

*Second*: That the defendant did so by the use of force or by threatening the imminent use of force; and

*Third*: That the defendant was armed with a dangerous weapon.

If you believe that from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty." (IPI Criminal 14.02.)

The series of instructions submitted to the jury defined the elements of armed robbery as well as the State's burden of proof as to the elements, stating that each element must be proven beyond a reasonable doubt. We therefore do not agree with defendant's contention that the jury was instructed to infer defendant's guilt of armed robbery merely from the recent, unexplained possession of stolen property.

The challenged instruction has been found to be proper where, as here, a defendant is in exclusive possession of recently stolen property (*People v. Johnson* (1979), 74 Ill. App. 3d 1037, 393 N.E.2d 40; *People v. Hendricks* (1976), 41 Ill. App. 3d 178, 353 N.E.2d 177), and defendant does not dispute the propriety of giving the armed robbery instruction itself. He does urge, however, that because there was no direct proof that the property in defendant's possession was stolen, the conclusion that the property was stolen is based on an inference which in turn forms the basis of the inference that defendant committed the armed robbery. The result, he maintains, is that the proof is too tenuous and reduces the State's burden.

There is no real distinction at law between direct and circumstantial evidence, and it is for the jury to decide the weight to be given to the circumstances shown. (*People v. Mitchell* (1975), 35 Ill. App. 3d 151, 341 N.E.2d 153; *People v. Asey* (1967), 85 Ill. App. 2d 210, 229 N.E.2d 368.) In *People v. Mitchell*, an armed robbery conviction was upheld although it

was based exclusively on circumstantial evidence similar to that in the instant case. The defendant in *Mitchell* lived in an apartment above the victim's store, and the victim was killed by a bullet in the back of his head in the course of a robbery in the store. There were no eyewitnesses. The following morning, the defendant was involved in an accident while driving the victim's car. Defendant was arrested more than three months later and numerous credit cards and items of identification belonging to the victim were found in his possession. His fingerprints were also found in the victim's car and there was proof that he was at the scene of the crimes. No gun was produced and the defendant did not testify, but there was proof that he knew the victim had been shot and robbed and that he had denied that knowledge. The court found the evidence to be overwhelming and affirmed the conviction.

In the instant case Sirikul was killed by a stab wound in the chest. He was last seen when he left his home in the morning to meet defendant, to arrange to sell his car to defendant and to return defendant's watch, which Sirikul was holding as security for a small loan. The afternoon of that same day, defendant picked up a friend in Sirikul's car and the two of them later cashed Sirikul's paycheck, using his identification. When defendant was arrested, he had various items which belonged to Sirikul, including his social security card, driver's license, student identification card and the certificates of title to his two cars, showing ownership still in Sirikul's name. He also had his own watch. Although no knife was found or offered into evidence, there was proof that defendant was known to carry a knife. In spite of its circumstantial nature, we believe the evidence to be sufficient to establish defendant's guilt of armed robbery beyond a reasonable doubt.

The inferences allowed here do not violate constitutional due process standards. In its most recent statement regarding the inferences and presumptions, the United States Supreme Court in *County Court v. Allen* (1979), 442 U.S. 140, 60 L. Ed. 2d 777, 99 S. Ct. 2213, stated that the permissive inference is the most common evidentiary device and it allows, but does not require, the trier of fact to infer an ultimate fact from the proof of a basic or evidentiary fact without placing a burden on the defendant. It stated further:

> "Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference." (442 U.S. 140, 157, 60 L. Ed. 2d 777, 792, 99 S. Ct. 2213, 2224.)

The court then held that the statutory presumption in question was

properly applied because the record as a whole, and not just the permissive presumption, established the defendant's guilt beyond a reasonable doubt. Because the prosecution had not relied exclusively on the presumption, the presumption needed only to satisfy the "rational connection" test set forth earlier by the court in *Leary v. United States* (1969), 395 U.S. 6, 23 L. Ed. 2d 57, 89 S. Ct. 1532, that the ultimate fact "more likely than not" flow from the basic facts proved. Additionally, the court noted that the instructions to the jury clearly stated the prosecution's burden of proof and that the presumption was merely a part of the prosecution's case.

In *Barnes v. United States* (1973), 412 U.S. 837, 37 L. Ed. 2d 380, 93 S. Ct. 2357, the Supreme Court considered the common law inference that the unexplained possession of recently stolen property is a circumstance from which a jury may conclude, in light of the surrounding circumstances shown by all the evidence, that the person in possession knew the property was stolen. Finding that common law inferences, in spite of their "impressive" historical basis, must meet the same due process standards as statutory inferences, the court examined the evidence in the entire record and concluded that the jury instruction as to the inference was proper because the inference satisfied the reasonable doubt standard, a more stringent standard than that required by *Leary*.

In *People v. Tyler* (1979), 78 Ill. 2d 193, our supreme court reversed the appellate court's conclusion that the conviction was based on a multiple inference that the defendant there was serving as a lookout during the commission of a rape and that he had the specific intent to facilitate the rape. In affirming the conviction, the supreme court found that the evidence as a whole supported the trial court's judgment.

██ In light of the principles of *Allen, Barnes, Leary* and *Tyler*, it is clear that the instruction given here was proper. The inference allowed was a permissive one and thus only a "rational connection" between the ultimate fact inferred and the basic facts proved was required. The evidence as a whole established defendant's guilt beyond a reasonable doubt and the verdict is therefore not based exclusively on the inference alone. Nor can we say that there were cumulative inferences here, for the instruction complained of cannot be read apart from the other instructions, which in their entirety informed the jury of the elements to be proved beyond a reasonable doubt based on the evidence as a whole.

## II.

Defendant also contends that the jury instructions for felony-murder, and hence the verdict of guilty on that charge, were tainted by the unexplained and exclusive possession instruction considered above. Defendant concedes that his position is predicated upon his argument

regarding the armed robbery instruction. It is sufficient to state here that because the jury was properly instructed as to the armed robbery, there was no error in the felony-murder instruction. We note further that the jury was also instructed as to the intentional, knowing and strong probability theories of murder. Defendant made no objections to any of the instructions and did not ask that the jury return special verdicts. Consequently, we find that the instructions were proper.

## III.

Defendant next contends that the identity of the victim was not established beyond a reasonable doubt in that there was no facial identification made by his friends, there was conflicting testimony as to the victim's race and the identification was not supported by technical evidence.

■■ The proof of death and the identity of the deceased may be established by circumstantial evidence. (*People v. Gendron* (1968), 41 Ill. 2d 351, 243 N.E.2d 208, *cert. denied* (1969), 396 U.S. 889, 24 L. Ed. 2d 164, 90 S. Ct. 179; *People v.. Schneider* (1935), 360 Ill. 43, 195 N.E. 430.) Circumstantial evidence is especially necessary where the remains are in such a condition that personal recognition is impossible and evidence of physical characteristics such as size, height or peculiar marks or scars on the body may be the only means of identification. (40 Am. Jur. 2d *Homicide* §289 (1968).) The resort to circumstantial evidence for identification was necessitated in the instant case by the fact that the body was found lying face down and the face was compressed and badly decomposed.

The body was positively identified as Taweeyos Sirikul by his fiancee, Busaba Burakasikorn, and by his long-time friend, Atchada Kesornsook. When Ms. Burakasikorn identified the body, she identified the clothing as similar to that worn by Sirikul the last time she saw him alive, when he went to meet with defendant. She also looked at the left arm of the body, where she recognized a mole. She was convinced that the body was Sirikul's and examined it no further, because she and Sirikul had identical moles which had occasionally been topics of their conversations. Kesornsook looked at the body twice, for several minutes each time. The first time, unable to recognize the decomposed face, he identified Sirikul on the basis of his body build. The second time, in order to be sure of the identification, Kesornsook looked for, and found, a pencil mark on Sirikul's right arm and a scar on his right forefinger.

Defendant maintains that the identifications by Ms. Burakasikorn and Kesornsook were undermined because they each looked exclusively for different marks, neither of which was recorded in the protocol of Dr. An,

the pathologist who performed the autopsy, who said he looked for distinguishing marks on the body. Neither Ms. Burakasikorn nor Kesornsook was asked about the identification made by the other, or the basis for it. Furthermore, that Dr. An did not notice the marks on the peeling, decomposing skin, does not negate the identification, and it was up to the jury to weigh the results of the observations made by the trained eye of the pathologist and the intimate eyes of Sirikul's close friends.

Similarly, defendant challenges the identification because Dr. An and the investigator for the medical examiner classified the body differently as to race. However, defendant overlooks the testimony of Weigle, the investigator, that he classified the body as Negro because the body appeared dark and was found in a neighborhood that was entirely black. Moreover, Dr. An, who testified as an expert, stated that the classification of a decomposed body is not precise and it was his practice to classify a decomposed body as black or white. In classifying the body as white, he noted that the greenish discoloration caused by decomposition makes it difficult to tell if the body is Oriental, hispanic or white.

Defendant also maintains that the alcohol level in the victim's blood raises doubt that it was Sirikul, who never drank. However, Dr. An testified that it is possible for a nondrinker to have a blood-alcohol level even higher than the level in the victim's body because of the formation of ethanol in the course of decomposition.

Defendant lastly points to the failure of the prosecution to resort to scientific evidence, although he cites no authority, and we find none, that requires the use of scientific evidence when positive identification has been made. Only three fingers provided prints that were possibly suitable for comparison and there is nothing to show that they were indeed suitable for comparison. While defendant claims that a dental comparison should have been performed, his offer of proof that dental records existed consisted only of a form filled out by Sirikul at Roosevelt University, on which he checked a box that said he had dental problems.

■■ Sirikul's body was positively identified by two of his intimate friends. The jury had the opportunity to consider all of the matters pertaining to Sirikul's identification, and we conclude that the points raised by defendant do not raise any reasonable doubt that the victim was indeed Taweeyos Sirikul.

## IV.

Defendant next contends that the trial judge erred in excluding evidence which, he maintains, was probative of the defense theory of the case and would have raised a reasonable hypothesis of his innocence. The gist of the defense theory is that the body found in the basement of

defendant's building was not that of Taweeyos Sirikul but that, due to the political situation in Sirikul's native Thailand, there was a conspiracy to make it appear that he was dead.

The defense sought to call the recordskeeper at Roosevelt University to testify that Sirikul had checked two boxes in a medical information form, one indicating that he had gum or teeth problems, the other stating that he had received medical treatment. Defendant claims that Ms. Burakasikorn's identification of the body was weak and that the identity of the victim could have been conclusively established by dental comparison. The reasoning of the defense is that when the failure to seek a better identification is combined with the fact that William Beaton, who headed the investigation firm Sirikul's relatives contacted, was also the personal investigator of Dr. Robert Stein, the chief medical examiner, the defense theory of conspiracy is corroborated.

The evidence was rejected, the court noting that the second box on the form did not refer to dentists at all. The State argued that there was no evidence that any dental records existed or that the medical examiner's office had knowledge of the existence of any dental records. The court then sustained the State's motion *in limine* to prevent the admission of the testimony, on the grounds that the matter was neither relevant nor material.

■■ The question of comparison of dental records as a means of identification was first considered in this district in *People v. Mattox* (1968), 96 Ill. App. 2d 148, 237 N.E.2d 845, in which the court affirmed a murder conviction where the victim had been burned beyond recognition. The victim's burning automobile was identified by his father and dental charts were used to firmly establish the identity. The court there stated:

"* * * it cannot be seriously disputed that a dental structure may constitute a means of identifying a deceased person, otherwise unrecognizable, where there is some dental record of that person with which the structure may be compared. Comparison of dental structures falls within the category of circumstantial evidence and involves the question of weight and credibility, rather than that of competency. [Citations.]" (96 Ill. App. 2d 148, 150-51, 237 N.E.2d 845, 846.)

The use of dental records, then, is appropriate where the victim cannot be recognized in some way and where dental records exist. In the instant case, however, the victim was recognized by Kesornsook as well as Ms. Burakasikorn, both of whom were cross-examined extensively regarding the basis of their identification. Under the circumstances a comparison of dental records was neither necessary nor required.

■■ Furthermore, defendant's offer was not of dental records themselves

but of a document which indicated merely that Sirikul had teeth and gum problems. The offer of the documents did not specifically set forth the facts which would be revealed. Its purpose, instead, was simply to raise speculation as to the possible existence of other evidence. This is not a sufficient basis for the admission of the document in question and we conclude there was no error in excluding it. (See *People v. Porter* (1975), 29 Ill. App. 3d 456, 330 N.E.2d 599.) No detriment to the defense theory was done by this exclusion. All of the facts pertaining to the identifications by Ms. Burakasikorn and Kesornsook, the absence of a dental comparison and other scientific means of identification, and the relationship of the private investigator to the medical examiner's office were before the jury. The document offered no additional evidence and posed no further questions as to the quality of the identification of the victim.

The defense also made an offer of proof that William Beaton, the private investigator hired by Sirikul's family, would testify that, when Sirikul's family and friends were interviewed, none told him of any mole, scar or identifying mark on Sirikul's body, that Beaton learned that Sirikul never drank and that Beaton was employed by the medical examiner's office. The trial court ruled that Beaton could testify, but not to any hearsay evidence, thus eliminating testimony regarding conversations with Sirikul's family and friends in the course of the investigation.

Defendant maintains that the failure of Kesornsook and Ms. Burakasikorn to tell the investigator about the mole and scar would have impeached their testimony and undermined their identification of Sirikul. However, neither Kesornsook nor Ms. Burakasikorn was ever asked if he or she related that information to the investigator. Accordingly, the trial court correctly ruled that no foundation was laid for the impeachment.

Most of the remainder of Beaton's offered testimony was in the record. Dr. Stein testified that Beaton was one of his investigators and there was testimony that Sirikul never drank alcohol. Moreover, Beaton was never called to testify, in spite of the trial court's ruling. We therefore find that the evidence was properly excluded.

Finally, the defense attempted to introduce evidence from Roosevelt University and the Department of Immigration that it believed was evidence of the claimed conspiracy. The evidence from Roosevelt University would show that they had sent the Department of Immigration certain documents pertaining to Sirikul, as they were required to do by law. The evidence from the Department of Immigration, in turn, would show that the documents were not contained in Sirikul's immigration file. The evidence would show, the defense continued, that Sirikul's address of record was his uncle's home in suburban Des Plaines rather than his Chicago apartment and that, contrary to the normal practice of the

Department, the file under the name of Sirikul contained records of Taweeyos Sirikul and a person named Tolsaporu.

The State objected on the grounds that the evidence was irrelevant and immaterial. The objection was sustained, the court noting that Sirikul was not being tried on immigration charges and that the defense had failed to establish any semblance of a conspiracy which would lay a foundation for the admission of the evidence.

■■ We conclude that the evidence was properly rejected. None of the immigration evidence was relevant to the identity of the victim. Although there may have been irregularities in Sirikul's file, they did not make it any less likely that Sirikul was the person found in the basement of defendant's apartment building. Nor do the irregularities tend to establish a conspiracy. The trial court may exclude evidence which serves no useful purpose (*People v. Love* (1978), 60 Ill. App. 3d 16, 376 N.E.2d 342; *People v. Lewis* (1976), 38 Ill. App. 3d 995, 349 N.E.2d 528), and the trial court here committed no error in excluding the immigration records in evidence.

We disagree with defendant's contention that the court's ruling on the evidence prevented him from presenting his defense. With the exception of the irregularities in Sirikul's immigration file, the subject matter of all of the excluded evidence was before the jury. Dr. An had testified that no dental comparisons had been made, although he acknowledged the effectiveness of that identification method. Dr. Stein testified regarding discrepancies in Sirikul's records in the medical examiner's office, stating that the preliminary death certificate showed that Sirikul's body was identified by his "fiancee" while the final death certificate showed the informant as his "wife." Dr. Stein also testified that the protocol was typed, but that the racial identification of "Oriental" was written by hand, and the differences in racial classification made by investigator Weigle and Dr. An were explored fully. William Beaton's dual role as head of the private investigation firm of Beaton and Associates and as personal investigator to Dr. Stein was disclosed to the jury, but defendant did not call Beaton to testify to determine his role, if any, in the instant matter. Frank Klee, who conducted the investigation for Beaton, testified about his background in military intelligence and his current status in the Air Force reserves as a criminal investigator. He also testified that his investigation of Sirikul's disappearance had nothing to do with his military work. Finally, there was evidence showing that Sirikul's father had a supervisory position with the Bangkok police and that two of his brothers also worked for the government, one for the police, one in the military.

The excluded testimony consisted of insufficiently founded hearsay, immigration records irregularities and the possible existence of dental

records as well as evidence which was otherwise substantially presented to the jury. While a defendant should be allowed to offer proof of any proper defense (*People v. Watson* (1966), 36 Ill. 2d 228, 221 N.E.2d 645; *People v. Davis* (1963), 29 Ill. 2d 127, 193 N.E.2d 841), the rule does not require abandoning the principles of evidence. We agree that defendant's conviction, based on circumstantial evidence, must be based on evidence that is inconsistent with any reasonable hypothesis of his innocence as well as consistent with his guilt (*People v. Wilson* (1948), 400 Ill. 461, 81 N.E.2d 211), but we find that the record here raises no reasonable hypothesis of defendant's innocence. The excluded matter did not make the defense of international conspiracy any more likely nor the identity of the victim as Sirikul any less likely. Accordingly, the trial court did not err in refusing its admission into evidence.

## V.

Defendant next contends that he was prejudiced by the State's rebuttal argument, citing the State's characterization of the defense theory as a "fraud," "fictional," "phony," and "poppycock," and the State's statement that defense counsel's imagination was "running wild."

The rebuttal followed a closing argument for the defense in which defense counsel argued that the State gave the jury quantity because it had no quality evidence. In summarizing the evidence, defense counsel noted that the State's "story gets a little better" when defendant's "friends" testified about the muffled thump coming from the trunk of the Trans Am. Referring to the prosecutor as "desperate" because he had no evidence, defense counsel argued that the State had put up a smoke screen: "You put up as much smoke as you can in front of the jury and yell and scream and that is how you expect to get a finding of guilty." Defense counsel then asked where Sirikul's relatives were and noted that none of them testified. Turning to Ms. Burakasikorn's testimony, defense counsel stated that it was uncorroborated and that she didn't appear upset because "maybe she didn't have to be" because Sirikul wasn't dead but was back in Bangkok. After again exploring the international conspiracy possibilities and the possibility of Sirikul's exchanging identities with someone and blaming it on defendant, who had the Trans Am, defense counsel stated:

"I don't know why people lie. I don't know why people lied. I don't know what went on. I don't know if Sirikul's dead or if Sirikul is laughing at us all back in Bangkok."

When the State's comments are seen in the light of what preceded them, it is clear that they were invited by the defense's argument. Similar responses to defense counsel's arguments have been found to be permissible. (See, *e.g., People v. Mitchell* (1975), 34 Ill. App. 3d 311, 340

N.E.2d 226; *People v. Turner* (1967), 82 Ill. App. 2d 10, 226 N.E.2d 667.) The State's comments in themselves do not constitute reversible error. (*People v. Smith* (1977), 53 Ill. App. 3d 395, 368 N.E.2d 561.) After examining them in the context in which they were made, we conclude that they do not accuse defense counsel of fabricating a defense and encouraging defendant to so testify (compare *People v. Freedman* (1954), 4 Ill. 2d 414, 123 N.E.2d 317), but are more in the nature of comments on the defense theory itself and the facts of the case. See *People v. Toliver* (1971), 133 Ill. App. 2d 266, 273 N.E.2d 274, and *People v. Turner.*

Defendant also contends that he was prejudiced by the State's resort to racial innuendo in its rebuttal argument, relying on *People v. Turner* (1977), 52 Ill. App. 3d 738, 367 N.E.2d 1365. In *Turner*, the victim was white, the defendant was black, and the prosecutor's argument was that the sole eyewitness, who was black and exculpated the defendant, had a good time watching "whitey" being beaten. The prosecutor also apologized for using such big words as "spectator" with the witness and again stated that the witness saw "blacky tromp whitey" and enjoyed it. The court held that the statements, in conjunction with factual mischaracterizations and other racial references and innuendos, were an appeal to the passions of the jury and an attempt to discredit the defense witness.

■■ No such situation existed here. The State's reference to race came in the context of saying that the defense theory was based solely on the fact that the victim was from Thailand and that it would have been different had Sirikul not been Thai. In *People v. Gary* (1976), 42 Ill. App. 3d 357, 356 N.E.2d 135, statements of the prosecutor, directed to the race of the victim rather than that of the defendant, and following defense counsel's attacks on the lifestyle and credibility of the State's witnesses and the plausibility of their testimony, were found not to be slurs against the defendant designed to arouse the prejudice of the jury. As in *Gary*, the comment here was based on the record and was invited by defense counsel's argument. The comments were not appeals to the prejudices of the jury and did not deprive defendant of a fair trial.

Moreover, we note that no objections were raised to the statements at the time they were made. Instead, defense counsel brought up the matter after the jury had begun its deliberations, thus preventing the court from taking action to prevent any prejudice to the jury. We have stated frequently that statements such as those made are not condoned, but, under the circumstances, due to the nature of the defense and the comments of defense counsel in his argument, we cannot say that they resulted in prejudice or require a reversal. *People v. Palmer* (1970), 47 Ill. 2d 289, 265 N.E.2d 627, *cert. denied* (1971), 402 U.S. 931, 28 L. Ed. 2d 866,

91 S. Ct. 1532; *People v. Nilsson* (1970), 44 Ill. 2d 244, 255 N.E.2d 432, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 296, 90 S. Ct. 1881.

## VI.

Lastly, defendant contends that the trial court abused its discretion in sentencing him, in that the court did not consider defendant's potential for rehabilitation and that the concurrent sentences of 150 to 300 years for murder and 20 to 60 years for armed robbery are excessive. We find no merit to this contention.

Section 5—4—1(a) of the Unified Code of Corrections (Ill. Rev. Stat. 1977, ch. 38, par. 1005—4—1(a)) provides for a sentencing hearing in which the trial court shall: consider the evidence received at trial; consider evidence and information in aggravation and mitigation; consider only presentence reports; hear arguments as to sentencing alternatives; and afford defendant the opportunity to make a statement on his own behalf. The record shows that this was done. Then, before pronouncing sentence, the court stated:

> "The trial court has a pre-sentence investigative report in front of him. I have read it. I will make it part of the record.
>
> The Court has taken into regard the nature and circumstances of the offense, the history and character of the defendant. And, once again the pre-sentence investigation is made part of the record."

It is clear that the trial court heard testimony that defendant was a good student and college material. It considered evidence from the presentence report that defendant had no problems in high school and that he was a "mild, pleasant, cooperative student."

The purpose of the Unified Code of Corrections is to:

> "(a) prescribe sanctions proportionate to the seriousness of the offenses and permit the recognition of differences in rehabilitation possibilities among individual offenders;
>
> (b) forbid and prevent the commission of offenses;
>
> (c) prevent arbitrary or oppressive treatment of persons adjudicated offenders or delinquents; and
>
> (d) restore offenders to useful citizenship." (Ill. Rev. Stat. 1977, ch. 38, par. 1001—1—2.)

Contrary to defendant's contention, the objective of restoration to useful citizenship does not outweigh the other objectives and we find no requirement that specific words must be used to indicate the consideration of his rehabilitative potential.

■■ Defendant's reliance on *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882, is misplaced. *Perruquet* involved the sentencing of a 21-year-old who was married, the father of two children, and had a history

of criminal activity. The supreme court reinstated the trial court's sentence of 1 to 20 years for burglary, reversing the reduction of the sentence to 1 to 5 years by the appellate court, finding that the record disclosed no abuse of discretion and that the sentence therefore could not be altered on review. The principles of *Perruquet* are directly applicable here and lead to the conclusion that the sentence was proper. All of the statutory requirements were met and defense counsel presented a statement to the court in support of defendant's rehabilitative potential. As in *Perruquet*, the trial court here was fully informed of defendant's past, his family situation and his personal traits, including his educational potential. The court was also fully informed as to the nature of the offenses and their surrounding circumstances. The judge was faced with the task of weighing the commission of a heinous crime against the absence of a criminal record and the presence of educational potential. (*People v. Jenkins* (1978), 67 Ill. App. 3d 565, 384 N.E.2d 1348; *People v. Smith* (1978), 59 Ill. App. 3d 480, 375 N.E.2d 941.) The sentences are within the range authorized by statute, and we cannot say that they reflect an abuse of the trial court's discretion.

For all of the foregoing reasons, the judgment of the trial court as to the convictions and sentences for the murder and armed robbery are affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.