THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DALE D. FINCH, Defendant-Appellant.

Second District    No. 79-231

Opinion filed July 22, 1980.

Mary Robinson and David S. Morris, both of State Appellate Defender's Office, of Elgin, for appellant.

Daniel D. Doyle, State's Attorney, of Rockford (Phyllis J. Perko and William L. Browers, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE SEIDENFELD delivered the opinion of the court:

Following a jury trial, Dale D. Finch was convicted of two counts of armed robbery and two counts of murder. He was sentenced to a term of 50-100 years on each murder count and to a single sentence of 4-12 years on the two armed robbery counts, the three sentences to run consecutively. Defendant appeals, contending that the trial court improperly denied his motion to suppress evidence. Alternatively, he argues that his sentences should be concurrent.

On December 24, 1976, two attendants were killed during an armed robbery of a service station in Rockford at about 6 p.m. Rockford detectives investigating the incident had information that defendant had been identified as having been in the station approximately 15 minutes before the bodies of the victims were found. They also had information that defendant was on parole from a forgery conviction in Minnesota. Pursuing the investigation, the officers arrived at the apartment of Joyce Clark, with whom defendant was living, at 12:15 a.m. on December 25. Defendant and Clark were both present and both consented to a search of the apartment. When the officers talked to Joyce Clark in the kitchen they informed her that they were looking for a gun. She told them that defendant told her that he had a gun but that she had never seen it. No evidence was uncovered during the search of the apartment, and after the police finished the search, they asked defendant if he would come to the police station so that they could continue their investigation. The officers testified that "he readily agreed to come with us."

At the station, after being given his rights and signing a rights waiver form, defendant was interrogated for approximately three hours during which he gave a statement essentially denying his involvement in the crime. He stated he had previously worked at the station but had been discharged after he had been arrested for violation of the controlled substance act; that on the day in question he stopped at the station at approximately 5:25 or 5:30 and talked to the two attendants; that he was then told by the assistant manager that he didn't want defendant standing

around the station and left after a few more minutes, or approximately 20 minutes to six. In his statement he also accounted for his whereabouts at other times during the day and evening of December 24.

At about 4 a.m., after the statement was given, the police informed defendant's parole officer who was in the building of "what Dale had told us pertaining to his brother's gun[1] and what his girl friend had told us about the weapon." They also told the parole officer that "his story did not jive [sic] with the time and the investigation." The parole officer authorized a hold being placed on defendant, and he was taken to a cell in the jail.

At about 10:30 a.m. on December 25, defendant was taken from the jail to an interview room at the detective bureau in the police station, again advised of his rights and again signed a waiver form. He was questioned concerning discrepancies between his earlier statements and those of other witnesses. The officers also testified that they talked about a "gun missing from his sister's house." After about 45 minutes of questioning defendant admitted involvement in the crimes. He agreed to go back to the service station and reenact the crime and also show the police where he had thrown the gun he had used. This he did, and the reenactment was video taped. Defendant then gave a second statement inculpating himself. He repeated that he had been at the station for 10 or 15 minutes when he was told that he couldn't hang around; that he had a .22-caliber revolver in his pocket which he had gotten from a holster in the closet at his sister's house on the afternoon of December 23; that he first walked away and then went back to the service station. He then detailed the circumstances of the armed robbery. He said that before he picked up the money "the other guy turned and the right side of his face was facing me" and:

> "I must had [sic] shot him at this time. I must have then shot Randy, who never did turn around and look at me. * * * I know that I went back to the gas station to rob them, but I didn't have any intentions of killing those two boys."

Defendant contends that he was arrested without probable cause and thus that the evidence and statements obtained from him thereafter should have been suppressed as the fruits of the illegal arrest. We disagree.

From the position taken by defendant both in the trial court and before this court it appears without serious controversy that the arrest took place at approximately 4 a.m. on December 25, 1976, pursuant to an authorization to hold defendant given by his parole officer based on information that defendant possessed a gun. We conclude that at that time the authorities, in arresting the defendant did not violate his fourth

---

[1] The reference to the "brother's gun" is not found in the initial statement, however.

amendment constitutional rights. Arguably, the information known to the officers at 4 a.m. was insufficient to establish probable cause to arrest defendant for the armed robbery and the murders. However, it was supportive of an arrest for a parole violation based upon reliable information that defendant had violated the terms of his supervision.

It is, of course, apparent that the police in advising defendant's parole officer of the information as to the gun and receiving his authorization to hold defendant in that connection as a parole violator were not purely motivated to prove a parole violation. We therefore do not take refuge in the series of cases which have held that the exclusionary rule does not generally apply in probation (parole) revocation proceedings. (*People v. Dowery* (1975), 62 Ill. 2d 200, 204-06.) In those cases the legality of the parolee's detention or arrest is not decisive; the focus being on the police harassment of persons who are in a supervisory status, that is, the nature of police conduct or misconduct. (*Dowery,* at 207.) In the context of probation revocation proceedings less than probable cause has been held to justify the arrest. (*People ex rel. Jefferson v. Brantley* (1969), 44 Ill. 2d 31, 34.) In what we perceive to be the better recent decisions something less than probable cause applies when a parole officer arrests or searches his parolee. (See Annot., 32 A.L.R. Fed. 155, 168-70 (1977).) *Brantley* has been held not to automatically apply so as to deprive a defendant of his constitutional protection from illegal search and seizure in connection with the investigation of criminal charges other than the violation of an unrelated term of his parole. (*People v. Eastin* (1972), 8 Ill. App. 3d 512, 519.) When, as here, the arrests cannot be said to be purely motivated by the parole violation, the arresting officers should have what would closely approximate probable cause to believe that the parole violation has occurred.

■■ We are satisfied that the police did have probable cause to believe that defendant had violated his parole by possessing a gun during his supervisory period. The record shows that prior to 4 a.m. the police had information that established the presence of defendant at the crime scene where a gun had been used about 15 minutes prior to the occurrence; and that he was a former, discharged employee. In addition they had information that defendant possessed a gun supplied by defendant's girl friend. They also had apparent corroboration that her information was reliable since they were in possession of a gun holster cartridge belt and knowledge that the gun was missing from the holster in defendant's sister's apartment where they had been informed it was being kept. In total this was sufficient to establish probable cause.

Even if the arrest was illegal for lack of probable cause, the incriminating statements were not obtained by exploitation of the illegal arrest and thus need not have been suppressed. (*Brown v. Illinois* (1975),

422 U.S. 590, 45 L. Ed. 2d 416, 95 S. Ct. 2254; *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248.) *Brown* and *Dunaway* hold that the salient factor in determining whether a statement is obtained by exploitation of an illegal arrest is the purpose and flagrancy of police misconduct.

In the circumstances of this case, we do not find that defendant was arrested in bad faith by officers who knew they lacked authority to detain him. There is no evidence that the officers misinformed or deceived the parole officer to induce his authorization. The police could reasonably and in good faith have relied on the parole officer's exercise of authority over his parolee. Thus any violation of the fourth amendment would have been merely technical rather than purposeful or flagrant, so that deterrence of police misconduct would not be served by suppressing the statements. *Cf. People v. Gabbard* (1979), 78 Ill. 2d 88, 98-99.

Other pertinent factors also weigh against suppression. The time gap between the arrest and the confession was 7 hours. *Miranda* warnings were properly given. Further, the evidence indicates that the confession was prompted, at least in part, by intervening circumstances. Defendant had been left alone for several hours prior to his giving the 11 a.m. statement. It appears that the statement when given was prompted by the defendant being advised by the officers of discrepancies in his earlier statement, compared with the statements of other persons as to his whereabouts, and the information concerning the missing gun. See *People v. Gabbard* (1979), 78 Ill. 2d 88, 99.

On the issue of consecutive sentencing we find no error in the meting out of consecutive sentences for the offenses of armed robbery and murder. The defendant stated that when he went back to the service station to commit the robbery he "didn't have any intention of killing those two boys." That statement is evidence of a "substantial change in the nature of the criminal objective" (Ill. Rev. Stat. 1975, ch. 38, par. 1005—8—4(a)) from robbery to murder so as to allow consecutive sentences for armed robbery and murder.

We also conclude that it was not error to impose consecutive sentences for the two murders. Each offense involved separate elements, and each was committed against a different victim. *People v. Davis* (1974), 20 Ill. App. 3d 948, 956; *People v. Lindsay* (1978), 67 Ill. App. 3d 638, 647; *People v. Schlemm* (1980), 82 Ill. App. 3d 639, 649.

The judgments are affirmed.

Affirmed.

VAN DEUSEN and UNVERZAGT, JJ., concur.