THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
LARRY W. EYLER, Defendant-Appellee.

Second District   No. 84—126

Opinion filed April 26, 1985.

LINDBERG, J., dissenting.

Fred L. Foreman, State's Attorney, of Waukegan (Raymond McKoski, Assistant State's Attorney, and Phyllis J. Perko and Cynthia N. Schneider, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

David P. Schippers & Associates, of Chicago, for appellee.

JUSTICE UNVERZAGT delivered the opinion of the court:

We are required in this cause to determine whether the circuit court of Lake County properly applied the precepts of the fourth amendment to the Constitution of the United States in holding that Larry W. Eyler, the defendant, was illegally detained at the time he and his motor vehicle were searched and he made statements and, therefore, whether the circuit court was correct in suppressing the evidence emanating from that detention and search.

The defendant was charged in a three-count indictment with the August 31, 1983, murder of Ralph Calise in Lake County, Illinois. The defendant pleaded not guilty and filed nine pretrial suppression motions. The circuit court granted five of the motions. The State filed a certificate of impairment pursuant to *People v. Young* (1980), 82 Ill. 2d 234, and then brought this appeal under the authority of Supreme Court Rule 604(a) (87 Ill. 2d R. 604(a)), contending that the circuit court erred in suppressing the evidence.

The key to all of the suppression motions was the warrantless search and seizure conducted by the Indiana State Police at a point on Interstate Highway 65 near Lowell, Indiana, on September 30, 1983. The defendant was traveling south on Interstate Highway 65 in northern Indiana when he was stopped by an Indiana State trooper for a traffic violation. The initial stop extended to a 12-hour station house detention of the defendant regarding his involvement with homosexual murders in Indiana. The defendant's truck and a bag inside the truck were searched, and the defendant's boots were seized.

After a lengthy evidentiary hearing, the circuit court ruled that although the initial traffic stop of the defendant in Indiana on September 30, 1983, was proper, the 12-hour detention of the defendant was not supported by probable cause. The circuit court found that the defendant's statement and consent to search his vehicle were voluntary, that both were tainted by his illegal seizure, and that the resulting evidence must be suppressed.

The facts are not in dispute, and we will summarize them as they were revealed at the suppression hearing.

Close to 7 a.m. on September 30, 1983, Indiana State Trooper Kenneth Buehrle was patrolling northbound in an unmarked squad car on Interstate Highway 65 in the northwestern part of Indiana. He observed two men emerging from the ditch on the southbound side of the interstate. One of the men carried a bag. A silver pickup truck was parked on the shoulder of the road about 15 yards south of the men. Parking along the interstate was prohibited.

Buehrle crossed the median and entered the southbound lanes. Since the pickup truck was driving away, the trooper activated the car's red lights and stopped the truck. As Buehrle approached the truck, he noticed the vent window on the passenger side was missing.

The trooper advised the driver, who was the defendant, of his reason for stopping the vehicle. Buehrle asked for the defendant's driver's license and for the truck's registration. He also asked the passenger, Darl Hayward, for identification. When Buehrle asked what they were doing in the ditch, the defendant explained that he was going to the bathroom. Buehrle asked Hayward about the bag he was carrying and Hayward said it contained toilet paper. The trooper asked if he could look inside the bag. Buehrle observed that the bag contained personal items but no toilet paper. Hayward said they used all of the paper. Buehrle knew that the nearest restroom facilities were six miles south and two miles north.

The defendant produced an Indiana driver's license and proper truck registration. Hayward had identification as well. Buehrle asked

the defendant to accompany him to the squad car in order to check on the license. While the defendant sat on the passenger side of the squad car, Buehrle called on the radio for a warrant check on the defendant and Hayward. Buehrle wrote a warning ticket for illegal parking on the interstate. The dispatcher requested Buehrle's location in code, which indicated to Buehrle that there was some sort of problem. However, he did not know what the trouble was.

Sergeant Peter Popplewell was at the Lowell police post when Buehrle called the dispatcher. The dispatcher told Popplewell that he believed the defendant was the suspect listed on the information sheet regarding certain murders and that the truck's description was the same. Popplewell then drove to where Buehrle was located. En route he received information that the defendant was a suspect in certain murders and that the defendant and Hayward should be brought in for interrogation and the truck impounded.

Popplewell arrived at Buehrle's location and showed Buehrle the information sheet. They were joined by Sergeant William Cothran, also of the Indiana State Police. Popplewell told Buehrle that he was bringing the defendant and Hayward in for questioning and impounding the truck. The defendant was then removed from Buehrle's squad car, placed in the straddle position, and patted down for weapons. The defendant was handcuffed and locked in Buehrle's car. The seat belt was also secured around him.

Hayward, who was still sitting in the defendant's truck with the engine running, was also patted down and handcuffed. He was placed in Popplewell's squad car. Cothran looked in the truck's interior to see if there were any weapons when Hayward was removed.

Buehrle said the bag Hayward showed him was not the same bag he saw the men carry from the ditch. Cothran then returned to the truck and searched the interior. He removed a second bag, lighter in color than the one Buehrle examined, from under the seat. The bag contained various lengths of rope and white tape. Cothran returned the bag to the truck.

The defendant was then transferred to Cothran's car. Before he was removed from Buehrle's squad car, Buehrle read him the *Miranda* warnings.

Buehrle drove to the area, where he first saw the defendant and Hayward. He was joined there by another trooper. They conducted a 10-minute search. While the ground covering indicated that people had walked in the area, no toilet paper was found.

Cothran, who was taking the defendant to the Lowell police post, stopped at the location where Buehrle was searching. He asked that

defendant what he was doing under the bridge and how the defendant got down there. The defendant said he "took a crap" and indicated the location. Buehrle was apparently searching in the wrong area. Cothran informed Buehrle of this, but a further search revealed nothing.

Cothran then drove the defendant to the Lowell police post and Buehrle followed in his car. They arrived at about 7:30 a.m. The defendant's belt and boots were removed and he was asked to empty his pockets. The handcuffs were removed, and he was placed in a holding cell.

During the time the defendant was in Cothran's car, Hayward was secured in Popplewell's car. Popplewell was waiting for the tow truck at the initial detention site. He asked Hayward for identification. Hayward asked what was going on, and Popplewell advised him that the defendant was a suspect in some homosexual killings. Popplewell told Hayward that he was a possible accomplice. Hayward said that he had just met the defendant and knew nothing of any killings. Popplewell interrupted Hayward to read to him the *Miranda* warnings and repeated his earlier comments. Hayward indicated that he was willing to tell Popplewell anything he knew.

Hayward told Popplewell that he was hitchhiking from Chicago to Indianapolis when the defendant picked him up. While they drove from Illinois to Indiana, the defendant repeatedly offered Hayward $100 if Hayward would allow the defendant to tie up Hayward for sexual purposes. Hayward refused. He said that the defendant made the offer while in Indiana.

The defendant and Hayward stopped along Interstate 65 because the defendant wanted to go to the bathroom. The defendant repeated his offer near the ditch and displayed a $100 bill. Hayward again refused. The defendant asked Hayward to pull up his shirt and Hayward complied. The defendant said Hayward "looked great." Hayward admitted to Popplewell that he was a homosexual.

The conversation with Hayward lasted about 20-25 minutes. The tow truck arrived and the defendant's pickup truck was transported to the Lowell police post, where it was secured with tape. Popplewell drove Hayward to the police post, where Hayward made a second tape-recorded statement and gave a written statement.

The Indiana State Police testified that the defendant was not under arrest. However, the defendant testified he believed he was under arrest. The defendant stated that although he repeatedly asked the officers at the initial stop what was happening, he was not told anything. Later, at the Lowell police post, the defendant was told he was

a suspect in a "major felony case." Still later he was told that he was being held for questioning with regard to homosexual murders. When he asked if he would be allowed to leave, the defendant was told that he could be held for "pandering, prostitution."

It was stipulated that the law in Indiana at the time made it a crime to patronize a prostitute.

While the defendant was at the Lowell police post, three officers from the Central Indiana Multi-Agency Investigative Team (task force) arrived from Indianapolis to question the defendant. The task force was formed to review eight murder cases in the central Indiana area and to assist surrounding counties in murder investigations. It was assisting in the investigation of three murders in Lake County, Illinois, as well. The defendant was a suspect in certain homosexual murders because of a telephone call received from someone who knew the defendant and other information gathered in investigating that call. However, there was no warrant for the defendant's arrest, and a task force officer said they lacked probable cause to arrest the defendant for the murders at that time. The officer claimed that there was probable cause to arrest on the prostitution charge.

The task force had given information to Detective Sergeant John Pavlakovic of the Indiana State Police concerning the murders prior to the defendant's detention. The murders were of young males who were bound, stabbed, their pants taken down, and left in remote rural areas. A description of the defendant was given to the Lowell post with instructions to contact Frank Love, the assistant commander of the task force, if there was information on the defendant. Instructions were, however, that the defendant was not to be arrested.

The defendant was questioned by the task force and he made a statement. He waived his *Miranda* rights and consented to a search of his truck. The defendant asked if he could leave at about 5 p.m. and was told that he could but that his truck was still being searched. The defendant eventually left the post at approximately 7 p.m. He was not charged with any crime. Although the police said he consented to being photographed and fingerprinted before leaving, the defendant claimed he was not given a choice.

Some of the items found in the defendant's truck included the bag with the rope and white tape. A hunting knife with blood was discovered. Tire prints were made as well. The defendant's boots were taken and kept because the soles were similar to the soles that appeared in boot prints found at a Lake County, Illinois, murder scene.

The State presents four issues on review. However, all four issues involve the initial determination by the trial court that the defendant

was illegally seized for the purpose of interrogation regarding certain murders. The issues are: (1) whether probable cause to arrest the defendant arose during a proper *Terry* stop; (2) whether probable cause to arrest the defendant for a separate crime arose based on the statement of Hayward during the illegal seizure of the defendant; (3) whether evidence found in the defendant's truck should not have been suppressed because its discovery was inevitable; and (4) whether the search warrant stated probable cause.

■■ Arrest is a mixed question of fact and law. (*People v. Loftus* (1983), 111 Ill. App. 3d 978.) Since the facts of the defendant's seizure were not disputed, the trial court's determination that an illegal arrest occurred based on the facts presented was a legal one which is subject to *de novo* review. *People v. Sain* (1984), 122 Ill. App. 3d 646.

The trial court provided a detailed explanation of its rulings on the motions. The essential finding, upon which the others rest, was the court's determination that the September 30, 1983, seizure of the defendant by the Indiana State Police was illegal. Although the initial stop for a traffic violation was valid, the court found that the defendant was subsequently taken into custody for the purpose of interrogation without probable cause. The defendant was patted down, handcuffed and placed in a squad car. These facts were noted by the trial court when it determined that for all purposes the defendant was under arrest and there was no probable cause to support the seizure nor sufficient justification for a *Terry* investigation.

The State asserts that Trooper Buehrle's initial stop of the defendant for a parking violation was valid (*People v. Flowers* (1982), 111 Ill. App. 3d 348), and during the valid stop the defendant was recognized as a suspect in certain murders. This information allowed for a *Terry* stop in order for the police to further investigate. (*People v. Vena* (1984), 122 Ill. App. 3d 154; *People v. Ellis* (1983), 113 Ill. App. 3d 314.) While the defendant was lawfully detained, the police learned of facts which provided probable cause to arrest the defendant for the crime of patronizing a prostitute. The probable cause to arrest allowed the defendant to be taken into custody, thus making the 12-hour station house detention proper.

■■ The defendant concedes that the initial traffic stop was valid. However, he suggests that Buehrle exceeded the bounds of a *Terry* stop by requesting a warrant check. A warrant check conducted pursuant to a valid *Terry* stop is permissible and does not convert the stop into a full-fledged arrest. (*People v. Ellis* (1983), 113 Ill. App. 3d 314.) Buehrle's request for a warrant check was proper.

Having determined that the initial stop was proper, the State con-

tends that the further detention of the defendant was justified as a *Terry* stop. Although Buehrle did not personally possess the information sufficient to detain the defendant for investigation, Sergeants Pavlakovic and Popplewell had information which identified the defendant as a murder suspect. The knowledge of each officer was the knowledge of all. *People v. Peak* (1963), 29 Ill. 2d 343.

Although the defendant does not specifically contradict the State's reliance upon the imputed knowledge of the officers, he does claim that Buehrle had no suspicion regarding the defendant's possible involvement with any murders. The defendant states that the trial court was required to look at the facts known to the officer making the arrest.

In *United States v. Lomas* (9th Cir. 1983), 706 F.2d 886, the court held that the officer who coordinates the investigation does not have to have personal knowledge of all of the facts necessary for an arrest. A group of agents acting in concert can pool their information and supply the requisite probable cause. In the instant case, the knowledge of Sergeants Pavlakovic and Popplewell regarding the defendant as a *possible* murder suspect was also the knowledge of Trooper Buehrle, as the officers were acting in concert. *People v. Waln* (1983), 120 Ill. App. 3d 73; *People v. Johnson* (1982), 104 Ill. App. 3d 572.

The State claims that at the time the *Terry* stop began, the officers could stop and temporarily detain the defendant when they became aware of specific and articulable facts which, taken together with reasonable inferences drawn from the officers' experience, reasonably warranted the extent of the intrusion upon the defendant. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. Beil* (1982), 110 Ill. App. 3d 291.) It further contends that searching, handcuffing, and placing the defendant in the squad car to be transported to the search scene were actions that did not constitute an arrest. The State concedes that at this point in time there was no probable cause to arrest the defendant. The detention of the defendant while a search of the ditch was conducted was a proper *Terry* stop. The State asserts that the limits of a *Terry* stop were not transgressed. In support of this contention the State relies upon *People v. Lippert* (1982), 89 Ill. 2d 171; *People v. Vena* (1984), 122 Ill. App. 3d 154.

The defendant argues in response to the State's position that he was under arrest when he was searched, handcuffed, and placed in the squad car. He contends the officers exceeded the limits of a *Terry* stop if, indeed, a temporary detention was valid.

A stop is considered a seizure for purposes of applying the fourth amendment. (*People v. Roberts* (1981), 96 Ill. App. 3d 930.) Whenever a person's freedom has been restrained in some way by a police officer, a seizure has occurred. (*Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. Kiser* (1983), 113 Ill. App. 3d 501.) The instant defendant was definitely not free to walk away from the officers. The issue is whether this was a proper *Terry* stop.

The United States Supreme Court established a limited exception to the requirement that seizures be based upon probable cause in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868. (*People v. Lippert* (1982), 89 Ill. 2d 171.) An investigatory stop is proper under *Terry* when the police officer can point to specific and articulable facts which, taken together with rational inferences therefrom, reasonably warrant the intrusion of the stop. (*Terry v. Ohio* (1968), 392 U.S. 1, 21, 20 L. Ed. 2d 889, 906, 88 S. Ct. 1868, 1880; *People v. Long* (1983), 99 Ill. 2d 219, 228.) Probable cause is not required for an investigatory stop. (*People v. Mills* (1983), 115 Ill. App. 3d 809.) A *Terry* stop involves the "stop" or detention of a person based upon a reasonable, articulable suspicion of criminal activity and the "frisk" or pat-down search for weapons of the person detained. (*People v. Martin* (1984), 121 Ill. App. 3d 196, 204.) An objective standard is applied to determine whether the stop is reasonable and a mere suspicion or hunch is insufficient. (*People v. Vena* (1984), 122 Ill. App. 3d 154.) The *Terry* rules have been codified in the Illinois Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, pars. 107—14, 108—1.01). *People v. Ellis* (1983), 113 Ill. App. 3d 314.

Whether a *Terry* stop was justified in the case at bar must be determined from the particular facts. (*People v. Mills* (1983), 115 Ill. App. 3d 809.) The officers knew that a person matching the defendant's description was "wanted" as a possible suspect in some murders of a homosexual nature. The defendant's name was similar to the suspect's name, which was written as "Larry Eyle" on the information sheet. The defendant's truck also matched the description provided. The murder victims' ages approximated that of the defendant's passenger, Hayward. The victims, having been bound and stabbed, were found in rural, remote areas of Indiana. The defendant and Hayward were seen emerging from a ditch along an Indiana interstate at about 6:50 a.m. Hayward was carrying a bag. The area was similar to the locations where the victims were found. The defendant's explanation for parking along the road was to go to the bathroom. However, the defendant had just passed a restroom facility and there was another within a few miles.

The information was gathered from an investigation by the task force. An identified male contacted the police with information concerning the defendant's possible involvement in the murders. The person, who knew the defendant, was interviewed by the police. Further investigation showed that in 1978, the defendant was arrested for stabbing a male he had tied up and disrobed while in a secluded, wooded area in Indiana. The defendant was also involved in an incident in 1982, but not charged, when a male hitchhiker was picked up by the defendant, given drugs and alcohol, and abandoned in a secluded, wooded area of Indiana. The police maintained surveillance of the defendant in July-August 1983, and observed him frequent gay bars and pick up hitchhikers. He was observed picking up a hitchhiker in a section of Indianapolis where two of the victims had lived. Certain murders in Illinois resembled the murders in Indiana. The defendant lived in Terre Haute, Indiana, but also went to Chicago frequently.

The defendant was only named as a possible suspect in the murders. The record shows no known criminal activity, other than the parking violation, at the time of the seizure. (*People v. Reynolds* (1983), 94 Ill. 2d 160.) While in some cases the report or suspicion of criminal activity is more immediate and closer in time and place to the *Terry* stop (see *People v. Pruitte* (1984), 125 Ill. App. 3d 580; *People v. Waln* (1983), 120 Ill. App. 3d 73; *People v. Kincy* (1982), 106 Ill. App. 3d 250), there are situations where no current criminal activity was reported but the stop was permissible. (*People v. Vena* (1984), 122 Ill. App. 3d 154; *People v. Martin* (1984), 121 Ill. App. 3d 196; *People v. Ellis* (1983), 113 Ill. App. 3d 314.) The defendant was "wanted" as a suspect prior to the stop along the interstate, and it seems likely that the police would have brought the defendant to the police post regardless of whether Hayward was present, a factor which the State argues served to amplify their suspicions. In fact, ·contrary to the State's argument, the evidence indicated that the police initially thought of Hayward as an accomplice, rather than as a possible victim.

■ The facts available to the officers warranted a person of reasonable caution to believe that an intrusion for further investigation was necessary. (*People v. Vena* (1984), 122 Ill. App. 3d 154.) However, a very limited intrusion was called for under these facts. The facts demonstrate, though, that the defendant had already been seized for the purpose of bringing him to the police post for questioning on the murders before a search of the area was conducted or Hayward made his statements. The defendant was en route to the police post when

Cothran, of his own volition, stopped at the search area. In *Vena*, the court sanctioned the brief, station house detention of the defendants under a *Terry* stop analysis because the transportation to the station house was not for the purpose of interrogation. Also, since there were blizzard-like conditions outside, the station house served to protect the defendants and police while an investigation of the area the defendants were seen in could be made. 122 Ill. App. 3d 154, 163.

■ The brief detention of a person for investigatory purposes and a search for weapons was deemed reasonable in *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868, because the governmental interest justifying the seizure outweighed the intrusion upon the individual's fourth amendment interest. (*People v. Long* (1983), 99 Ill. 2d 219, 227.) However, *Terry* provided only a limited exception to the general rule that seizures require probable cause to arrest. (*Florida v. Royer* (1983), 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319.) A custodial detention for purposes of interrogation was found to require probable cause to arrest in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. Illinois has followed *Dunaway* when the totality of the circumstances shows the defendant was taken into custody despite a disclaimer by the police that there was no intention to arrest. (*People v. Reed* (1982), 104 Ill. App. 3d 331.) Whether a custodial arrest is made depends upon the degree of the intrusion made upon the interest protected by the fourth amendment. *People v. Klein* (1983), 115 Ill. App. 3d 582.

Over the years the distinction between an investigatory or *Terry* stop and an impermissible seizure amounting to an arrest has become blurred. (*People v. Lippert* (1982), 89 Ill. 2d 171.) As noted by the *Lippert* court, there exists a "middle ground" (89 Ill. 2d 171, 182), where the minimal intrusion is justified when compared to the benefit of immediate investigation. (*People v. Vena* (1984), 122 Ill. App. 3d 154; see *People v. Lippert* (1982), 89 Ill. 2d 171.) The courts have sanctioned the limited transportation of a suspect on less than probable cause to arrest for the purposes of an immediate show-up. (*People v. Lippert* (1982), 89 Ill. 2d 171; *People v. Kincy* (1982), 106 Ill. App. 3d 250.) The physical restraint of suspects during a brief detention has also been permitted. *People v. Vena* (1984), 122 Ill. App. 3d 154.

Generally, every arrest and every seizure having the essential attributes of a formal arrest is unreasonable absent probable cause. (*People v. Kincy* (1982), 106 Ill. App. 3d 250.) Whether an arrest has occurred is not simply a question of whether the police acted reasonably under the circumstances, but whether a reasonable, innocent person would have considered himself under arrest if in the same situa-

tion as the defendant. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 165.) Two essential elements of an arrest are the intent of the officers and the understanding of the arrestee. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 148.) While the subjective beliefs of the defendant are irrelevant to a determination of whether the defendant was arrested, a disclaimer by the police of any intention to arrest does not mean the defendant was not taken into custody. (*People v. Reed* (1982), 104 Ill. App. 3d 331.) Relevant factors considered in determining the officers' intent include the absence of a declaration of arrest as well as the lack of such routine procedures as handcuffing, fingerprinting and photographing. (*People v. Clay* (1984), 124 Ill. App. 3d 140, 148.) Surrounding circumstances also looked at to determine whether the defendant was free to leave are the threatening presence of several officers, the display of a weapon by an officer, the physical touching of the defendant's person, or the officer's language or tone of voice which indicates that compliance with the officer's request could be compelled. *People v. Cart* (1981), 102 Ill. App. 3d 173, 183-84.

Trooper Buehrle was joined by Sergeants Popplewell and Cothran, who arrived at the scene in separate cars. The defendant was taken from Buehrle's squad car, where he had been waiting for Buehrle to complete a warning ticket and to conduct the warrant check. He was searched after being placed in the straddle position but no weapons, contraband or other items of a suspicious nature were found. The defendant was then handcuffed, restrained in the squad car with the seat belt, and the door was locked. The defendant's truck was searched and was going to be impounded.

The circumstances surrounding the defendant's detention indicates that he was under arrest despite the officers' disclaimers to the contrary. (*People v. Reed* (1982), 104 Ill. App. 3d 331.) The defendant was not told that he could leave or that he was not under arrest. (*People v. Townes* (1982), 91 Ill. 2d 32.) It is absurd to consider whether the defendant was free to leave when the amount of physical restraint used to detain him is viewed. *Cf. Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, wherein the defendant would have been physically restrained if he attempted to leave.

An important feature of the defendant's detention was handcuffing. In *People v. Gabbard* (1979), 78 Ill. 2d 88, the State admitted and the supreme court agreed that handcuffing the defendant therein constituted an arrest. Handcuffing was a serious restraint upon the instant defendant's liberty. (*People v. Hobson* (1983), 117 Ill. App. 3d 191.) Nor did the defendant consent to being handcuffed, a distin-

guishing feature relied upon by the *Hobson* court. See generally *People v. Clay* (1984), 124 Ill. App. 3d 140; *People v. Reed* (1982), 104 Ill. App. 3d 331.

The State argues that handcuffing the defendant, placing him in a squad car and transporting him to the search area were within the limits of a *Terry* stop under *People v. Vena* (1984), 122 Ill. App. 3d 154. This court in *Vena* (Nash, J., dissenting) sanctioned handcuffing, placing the defendant in a squad car and transporting him to a police station in order to investigate whether a crime occurred as a proper *Terry* stop. However, the defendant Vena had fled from the police when ordered to "freeze" and physically resisted the officer when he was caught. Also, the defendants in *Vena* were temporarily detained at the police station for the limited purpose of investigating whether a crime had been committed in the area. In the instant case the defendant was transported to the police post in order to interrogate him concerning certain murders. While the *Vena* decision offers support to the State's position that the defendant was legally detained within the limits of a *Terry* stop, we believe the *Vena* decision is distinguishable from the case at bar for the reasons noted.

In the case at hand, the defendant was restrained by being strapped in the squad car and the doors locked, his truck was searched and was towed to the police station. The defendant was read the *Miranda* warnings, and was then to be transported to the police station by Sergeant Cothran.

The defendant's detention resembles a traditional arrest. (*People v. Townes* (1982), 91 Ill. 2d 32.) As in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248, the officers were ordered to bring the defendant in for questioning. (*Cf. People v. Sanders* (1981), 103 Ill. App. 3d 700, wherein the officers were not under orders and the defendant agreed to accompany them.) The defendant was not given a choice to leave. The officers were also ordered to impound the defendant's truck. The circumstances indicate that the defendant was taken into custody for the purpose of interrogating him on the murders and not because he patronized a prostitute. His written statement shows that the defendant was not questioned on this offense. The police had already decided to bring the defendant in for questioning on the murders and were in the process of doing so when the State claims that probable cause to arrest the defendant arose on the separate crime. The defendant was already under arrest (without probable cause to support it) when Hayward made the incriminating statements. The seizure of the defendant without probable cause was an improper " 'expedition for evidence.' "

*Dunaway v. New York* (1979), 442 U.S. 200, 218, 60 L. Ed. 2d 824, 839, 99 S. Ct. 2248, 2259; accord, *People v. Townes* (1982), 91 Ill. 2d 32, 37; *People v. Fitzpatrick* (1982), 107 Ill. App. 3d 876, 879.

The officers could have asked the defendant to come to the Lowell police post. A voluntary consent to accompany officers to a station house for interrogation has been used by the courts to distinguish permissible station house interrogation on less than probable cause to arrest from the illegal custodial interrogation found in *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. *People v. Reed* (1982), 104 Ill. App. 3d 331; *People v. Cart* (1981), 102 Ill. App. 3d 173.

■ Therefore, the foregoing analysis supports a finding that the defendant was illegally seized for the purpose of custodial interrogation. Although a *Terry* stop was justified, the bounds were exceeded, and the defendant was under arrest without probable cause.

■ The last part of the State's argument in the first issue rests upon the assumption that the defendant was being held pursuant to a valid *Terry* stop when probable cause to arrest him for patronizing a prostitute arose. The State relies upon Hayward's statement to Popplewell as evidence of probable cause. It claims that the existence of probable cause to arrest the defendant on the other crime allowed the police to take the defendant into custody.

We have already determined that the permissible bounds of a *Terry* stop were exceeded and the defendant was illegally seized by the time Hayward made the statement. The fact that probable cause to arrest the defendant on a separate charge arose after the defendant was illegally arrested cannot be used to justify the illegal arrest in this case. (*People v. Nash* (1979), 78 Ill. App. 3d 172.) However, the effect of Hayward's statement must be examined in the context of the second issue.

Having concluded that the defendant was illegally seized, the second issue is whether probable cause to arrest the defendant for a separate crime arose based upon the statement of a live witness during the illegal seizure. The State claims that Hayward's statement was an independent action which intervened to attenuate the taint of the defendant's illegal arrest by providing probable cause to arrest for the offense of patronizing a prostitute. (*United States v. Brown* (7th Cir. 1980), 628 F.2d 1019; *United States v. Greer* (5th Cir. 1978), 566 F.2d 472.) Although the trial court found that Hayward's statement was tainted by the defendant's illegal detention, the State argues that the statement was attenuated from any taint because it was the product of a live witness subject to the exercise of free will. *United States v.*

*Ceccolini* (1978), 435 U.S. 268, 55 L. Ed. 2d 268, 98 S. Ct. 1054.

Popplewell testified that while Hayward was restrained in Popplewell's car he asked Popplewell what was going on. Popplewell explained the situation and told Hayward he was a possible accomplice. When Hayward began to talk, Popplewell read the *Miranda* warnings to him. Hayward said he would be more than willing to tell Popplewell anything he knew. Popplewell decided to take the opportunity to discover what Hayward knew, so he asked Hayward questions about himself and his association with the defendant. Hayward provided answers which included the defendant's offer to Hayward of $100 in exchange for a sexual act. Hayward made a recorded and written statement also at the Lowell police post.

The question to be decided is whether Hayward's statement to Popplewell was obtained by exploitation of the defendant's illegal arrest. (*People v. Finch* (1980), 86 Ill. App. 3d 493.) The facts demonstrate that Hayward was removed from the defendant's truck, searched, and handcuffed after the defendant was illegally arrested. Confronted with the knowledge of being a "possible accomplice" in homosexual murders, Hayward began "cooperating." While Hayward expressed a desire to assist the police, his statement was not sufficiently the product of free will to have dissipated the taint from the defendant's illegal arrest. (*United States v. Ceccolini* (1978), 435 U.S. 268, 55 L. Ed. 2d 268, 98 S. Ct. 1054.) Hayward made his statement within minutes of the defendant's illegal arrest while restrained in a police car. There was evidence that Popplewell questioned Hayward with the intent of obtaining information regarding the murders.

■ The trial court's finding that there was a direct "nexus" between the illegal arrest of the defendant and the subsequent statement made by Hayward is supported by the evidence. Hayward's statement was obtained by exploitation of the illegal arrest and not by means sufficiently distinguishable to be purged of the primary taint from the illegality. (*People v. Dangerfield* (1979), 78 Ill. App. 3d 1046.) The tainted statement cannot be used to establish probable cause to arrest the defendant on a separate crime.

Having determined that the circuit court was correct in suppressing the evidence as a result of the illegal seizure and search on September 30, 1983, the remaining issues presented by the State need not be addressed because the issues rest on the assumption of a valid arrest.

The judgment of the circuit court of Lake County is affirmed.

Judgment affirmed.

SCHNAKE, J., concurs.

JUSTICE LINDBERG, dissenting:

I dissent. In so doing I acknowledge my agreement with the majority that defendant was initially arrested without probable cause and therefore in violation of the proscriptions of *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. Additionally, I agree with the majority that the facts in *People v. Vena* (1984), 122 Ill. App. 3d 154, 460 N.E.2d 886, are inapposite if for no other reason than the fact that the removal of defendant in the instant case to the police station, as in *Dunaway*, was for the purpose of interrogation. In *Vena*, the majority did not view the removal of the defendants to the police station as more intrusive *per se* than detaining them in the open field or in the squad car. In fact, both the squad car and the station house protected the defendants and the police officers from the blizzard-like weather conditions. It did not appear that the transportation of the defendants to the station house was for interrogation or any other intrusive actions beyond awaiting completion of the investigation of the area just traversed by the defendants. (122 Ill. App. 3d 154, 163, 460 N.E.2d 886, 892.) Therefore, *Vena* is clearly distinguishable from the instant case.

However, I dissent from the majority opinion, because in the instant case I conclude the circuit court of Lake County prematurely determined the question of whether the police had probable cause to arrest defendant for the Indiana solicitation offense. I would reverse the order of suppression and remand the cause for trial and for a new determination of probable cause during the course of the trial or conclude as a matter of law that Hayward's statements were not the product of police illegality.

The lynchpin of the majority's reasoning in denying probable-cause-to-arrest status to Darl Hayward's statement accusatory of defendant is that it was not sufficiently the product of free will to have dissipated the taint from defendant's illegal arrest. (132 Ill. App. 3d at 806, citing *United States v. Ceccolini* (1978), 435 U.S. 268, 55 L. Ed. 2d 268, 93 S. Ct. 1054; *People v. Finch* (1980), 86 Ill. App. 3d 493; *People v. Dangerfield* (1979), 78 Ill. App. 3d 1046.) I disagree with my colleagues for several reasons. I believe they unreasonably construe Hayward's statement to be involuntary. They appear to misapply the "free will" test of *Ceccolini*. They do not follow the law relating to live-witness testimony established by *Ceccolini*. Finally, Hayward's statements against defendant were not the product of defendant's illegal arrest.

Factually, I do not believe that the colloquy between Sergeant Popplewell and Hayward leads to the conclusion that Hayward's statement was not the product of his free will. The majority discusses the manner in which Hayward was both arrested and accused of being an accomplice before he "cooperated." Yet, it was Hayward who first inquired about the reason for the police action. While undertaking to respond, Popplewell took the precaution of giving Hayward the *Miranda* rights and answered that defendant was a suspect in some homosexual killings and that Hayward was suspected as a possible accomplice. Popplewell asked no questions of Hayward other than his identification and his understanding of the *Miranda* rights. Hayward then said, "Hey, I have nothing to do with it, I just met the man, * * * I am more than willing to tell you anything I know," whereupon Hayward disclosed defendant's offer to him of $100 for a sexual act. I conclude that Hayward's statements were made of his free will in the sense that they were voluntary.

As a second factual consideration I note that the majority seems to equate the circumstances under which Hayward made the accusation as being relevant to a *Ceccolini* "free will" analysis for determining the existence of attenuation of the taint of illegal police activity. As I will discuss next, the factors underlying Hayward's statement as a live witness appear not to be determinative of that issue. See *United States v. Ceccolini* (1978), 435 U.S. 268, 276-77, 55 L. Ed. 2d 268, 277-78, 98 S. Ct. 1054, 1060.

The legal basis for my disagreement with the majority in the instant case lies in the striking factual parallels the instant case bears to *Ceccolini* and in the Supreme Court's identification and resolution of its dispositive question. A brief comparison discloses that the police illegality in *Ceccolini* was Officer Biro's unwarranted search of an envelope leading to his discovery of the money, policy slips and live-witness evidence. In the instant case, the illegality was defendant's initial arrest without probable cause. Whether this illegality "led to" Hayward's live-witness testimony is discussed later in this dissent. In *Ceccolini*, the illegal search and Officer Biro's immediate questioning of flowershop-clerk Hennessey is acknowledged by the Supreme Court to be the incident which "requires us, over three years later, to decide whether Hennessey's testimony against respondent Ceccolini should have been suppressed in his trial for perjury." (435 U.S. 268, 270, 55 L. Ed. 2d 268, 273, 98 S. Ct. 1054, 1057.) We are confronted with precisely the same exclusionary-rule question as was decided in *Ceccolini*, although there the illegality was a search and here it is an arrest.

Significantly, however, the Supreme Court in *Ceccolini* appears not to have relied upon the proximate relationship between the incident of police illegality (Biro's search) and the questioning of clerk Hennessey, which were virtually contemporaneous, but rather upon the continued willingness of Hennessey to cooperate by testifying against Ceccolini at trial many months later. The court said:

"The time, place and manner of the initial questioning of the witness may be such that any statements are truly the product of detached reflection and a desire to be cooperative on the part of the witness. *And the illegality which led to the discovery of the witness very often will not play any meaningful part in the witness' willingness to testify.*" (Emphasis added.) (435 U.S. 268, 277, 55 L. Ed. 2d 268, 277, 98 S. Ct. 1054, 1060.)

And later in its opinion, the court noted:

"The evidence indicates overwhelmingly that the *testimony* given by the witness was an act of her own free will in no way coerced or even induced by official authority as a result of Biro's discovery of the policy slips. Nor were the slips themselves used in questioning Hennessey. Substantial periods of time elapsed between the time of the illegal search and the initial contact with the witness, on the one hand, and between the latter and the *testimony at trial* on the other." (Emphasis added.) 435 U.S. 268, 279, 55 L. Ed. 2d 268, 279, 98 S. Ct. 1054, 1062.

In making these observations, the court stated that the particular knowledge to which Hennessey testified at trial logically could be traced back to Biro's discovery of the policy slips. Nonetheless, the court appears to have resolved the attenuation question on the basis of the witness' free-will testimony at trial after substantial periods of time had passed.

The only conclusion that can be drawn from *Ceccolini*, which controls the instant case, is that the temporal proximity of defendant's arrest and Hayward's live-witness accusatory statement is not determinative of the admissibility of the challenged evidence where the live-witness testimony attenuation of the initial taint is at issue. Under *Ceccolini*, a determination of the existence of probable cause to arrest defendant on the solicitation offense would have to be determined at trial and would turn on whether Hayward would testify of his own free will to facts establishing probable cause for defendant's arrest for solicitation. On this analysis, therefore, the final resolution of the probable cause issue by the circuit court of Lake County was premature. I would reverse the order of the circuit court of Lake

County and remand the determination of the issue of attenuation for trial.

I dissent for the further reason that I conclude that the police had probable cause to arrest the defendant for solicitation of prostitution. My disagreement with the majority on this point stems from my belief that Hayward's statements were not the fruit of defendant's illegal arrest, and so may properly be considered in making the probable cause determination.

The initial traffic stop and the warrant check pursuant to it were both proper. (132 Ill. App. 3d at 798.) Consequently, the police legally learned that defendant was a suspect in some homosexual murders. Based on that knowledge, the police took certain actions. They illegally arrested defendant. They also illegally arrested Hayward. The police questioned Hayward about defendant. It was this questioning of Hayward which resulted in the statements giving rise to probable cause to arrest defendant for solicitation for prostitution. Defendant Eyler lacks standing to rely upon the illegal arrest of nondefendant Hayward in seeking suppression of Hayward's statement. (*Rakas v. Illinois* (1978), 439 U.S. 128, 58 L. Ed. 2d 387, 99 S. Ct. 421.) Defendant's illegal arrest thus played no part in the chain of causation resulting in Hayward's statements, so those statements are admissible in deciding the probable cause question. When they are so considered, it is obvious that probable cause for defendant's arrest for solicitation for prostitution existed.

A hypothetical situation will serve to highlight the point to be made here. If, after the warrant check, the police had correctly concluded that they lacked probable cause to arrest defendant for murder, the proper course would have been to release defendant. However, it would also have been proper to question Hayward about defendant to obtain any information he would be willing to give. Since the police knew defendant was a suspect in some homosexual murders and Hayward was with him, the police almost surely would have questioned Hayward in this way. Upon being informed of the suspected involvement of defendant in homosexual murders, it is likely that Hayward, an apparently law-abiding person, would have told the police what he knew. Defendant then could have been arrested for solicitation for prostitution, and the evidence would have been seized pursuant to a lawful search of the pickup truck.

There remains to be considered the consequences of concluding that the police had probable cause to arrest defendant for solicitation for prostitution. Defendant was illegally arrested and, for a time, illegally detained. Probable cause to arrest arose from Hayward's state-

ments, a source independent of the illegal arrest, so defendant's *subsequent* detention was lawful. This also served to purge the taint of the illegal arrest, making evidence properly seized *after* probable cause arose admissible. *(United States v. Brown* (7th Cir. 1980), 628 F.2d 1019, 1022.) Under this analysis, the evidence seized pursuant to search warrants on October 1, October 31, and November 22, 1983, was admissible.

The evidence seized on September 30, 1983, was apparently seized *before* Hayward made his statements and thus *before* probable cause arose. This evidence was found in a paper bag inside defendant's pickup truck. That truck was later searched, *after* probable cause had arisen, with defendant's consent. Since the consent was obtained *after* probable cause had arisen, the consent was not tainted by the prior illegal arrest. *(United States v. Brown* (7th Cir. 1980), 628 F.2d 1019, 1022.) The search, being consensual, thus was lawful. Since the evidence had been easily discovered during the illegal search, it is clear it would have been discovered during the subsequent consensual search. Therefore, the evidence seized on September 30, 1983, should have been admitted under the inevitable discovery rule. *Nix v. Williams* (1984), 467 U.S. 431, 81 L. Ed. 2d 377, 104 S. Ct. 2501.

I would reverse the suppression order of the circuit court of Lake County.