THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* FRED REED, Defendant-Appellant.

First District (3rd Division)    Nos. 80-61, 80-68 cons.

Opinion filed February 3, 1982.

Ralph Ruebner and Susan Bandes, both of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, James S. Veldman, and Warren A. Zimmerman, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McGILLICUDDY delivered the opinion of the court:

Following a jury trial, the defendant, Fred Reed, was convicted of two counts of murder and one count of armed robbery. He was sentenced to concurrent prison terms of 50 to 100 years for each murder and 20 to 30 years for armed robbery.

On appeal the defendant raises the following issues: (1) whether the trial court erred in denying defendant's motion to quash his arrest and suppress evidence or, in the alternative, whether defendant's counsel was incompetent by presenting insufficient evidence to support that motion; (2) whether the trial court erred in refusing the compulsion instruction tendered by the defendant; (3) whether the defendant was accountable for the armed robbery offense; and (4) whether an armed robbery instruction tendered by the State was improper. This opinion will discuss only that testimony relevant to these issues.

The defendant and Lonnie Young, also known as Lonnie Hall, were indicted for the murder of Michael Robbins and the murder and armed robbery of Beverly Truitt. The indictments against Hall were *nolle prosequied.*

At the hearing on the defendant's pretrial motion to quash his arrest and to suppress evidence, the defendant presented one witness, Sergeant Edward Adorjan of the Chicago Police Department. Adorjan stated that on September 2, 1977, at about 4 p.m., he went with Investigators O'Connor and Zuley to the defendant's apartment located in the same building as the victims' apartments. Marie Brown, the defendant's girlfriend, was in the apartment. The officers were dressed in civilian attire. The defendant arrived a short while later, and Adorjan informed him that they wanted to question him regarding the deaths of Robbins and Truitt.

The defendant was asked to accompany the officers to the police station. Reed agreed to go and Brown was permitted to accompany him. Reed was not told that he was under arrest nor was he handcuffed. Adorjan never asked the defendant whether he wanted to answer the questions at his apartment, and at the station the defendant was never told he was free to go. Adorjan stated that the defendant would have been allowed to leave until about 8 p.m. Adorjan left the station at 5:30 p.m.

The defendant's motion to quash his arrest was denied. The defendant then made a motion to suppress the written and oral statements he made at the police station. During the hearing on this motion, Investigator Theodore O'Connor testified that the defendant agreed to go to the police station for questioning. At the station the defendant was taken to an interview room and was given his *Miranda* warnings. O'Connor conversed with the defendant for about a half hour and then talked to Marie Brown who was in the main office. O'Connor stated that after his first conversations with Reed and Brown, the defendant could have left the station.

Marie Brown testified that the police officers asked the defendant to accompany them to the station and that Reed said he would go. Neither Brown nor Reed were handcuffed by the police.

The defendant testified that on September 2, 1977, the police indicated to him that they wanted to question him about Robbins and Truitt. The defendant testified that he did not know the men were police officers when he went with them. The defendant also testified that he knew the men were officers because they had shoulder holsters and that he went with them involuntarily because he was told to go. After repeatedly being asked whether he was forced to go with the officers, the defendant repeatedly answered that he was told to go and had no other choice.

The defendant's second motion to suppress his statements was denied.

At trial, Investigator O'Connor repeated his testimony concerning his visit with Adorjan and Zuley to the defendant's apartment on September 2, 1977. He stated that the officers did not have their weapons drawn when the defendant arrived. O'Connor did not know whether the defendant would have been placed under arrest if he had refused to go to the station.

O'Connor further testified that at about 5 or 5:30 p.m., the defendant was taken into an interview room and was given his *Miranda* warnings. He was not handcuffed. Reed told O'Connor that he had known Robbins and Truitt and discussed the circumstances under which he had last seen Robbins alive on Saturday, August 27.

O'Connor then spoke to Marie Brown and thereafter had a second conversation with the defendant. O'Connor told the defendant that

Brown said she and Reed had seen Robbins on Sunday morning. The defendant then stated that "Big 50," a drug pusher, had held a meeting on Sunday and told Robbins, a heroin pusher, that no heroin would be sold. Robbins threatened to call the police and left.

O'Connor told the defendant that Denise Johns, Beverly Truitt's sister,[1] informed the police that Reed had given Robbins a .32-caliber automatic gun for protection. The defendant admitted that he had given Robbins a gun on Friday, August 26.

O'Connor stated that at about 9 or 10 p.m., he asked the defendant about two rings and a silver bracelet he was wearing because the items appeared to be feminine. The defendant could not remember the names of the stores he purchased the jewelry at and then stated he bought the rings from a "guy on the street" and found the bracelet in a garbage can. O'Connor testified that the defendant was no longer free to leave when he could not explain how he obtained possession of the jewelry.

After O'Connor left the interview room occupied by Reed, he took Marie Brown to another interview room and asked her about two rings she was wearing. He then showed the jewelry to Johns and returned to talk to the defendant. He asked the defendant whether the defendant had a necklace with blue stones. The defendant responded negatively and at 10:10 p.m. signed a form consenting to the search of his apartment. A short while later, Officers Epplen, Stachula and Zuley returned to the station with the necklace found in Reed's apartment. The necklace was shown to Johns and then to the defendant. At this point, the defendant was under arrest. At about 10:30 or 11 p.m., when the defendant asked if he could leave, he was told he would be placed in the lockup.

Sergeant Adorjan testified that on September 3, 1977, he interviewed Marie Brown at about 10:40 a.m. and interviewed the defendant at about 2:15 p.m. The defendant was given his *Miranda* warnings and was informed of statements made by Brown. The defendant told Adorjan about a meeting held several days before Robbins' death concerning narcotics traffic. After Robbins left the meeting, there was talk of killing him. The defendant further stated that on Sunday evening, at about 10:30 or 11 p.m., Lonnie Hall knocked on the defendant's apartment door, showed him a gun and told him that he wanted Reed to help him enter Robbins' apartment. The defendant and Hall went downstairs to Robbins' apartment. The defendant knocked on the door and identified himself. When Robbins opened the door, Lonnie Hall forced his way into the apartment and ordered Robbins to lie on the bed. Hall told the defendant to tie Robbins up and the defendant complied. Hall placed a pillow over Robbins' head and fired two shots. As Hall and the defendant were leaving Robbins' apartment, Beverly Truitt opened her apartment door.

---

[1] At the time of trial, Denise Johns was deceased.

Hall pushed her into the apartment. The defendant heard two shots and saw Hall come out with some jewelry. The defendant asked for some of the jewelry and was given three or four rings, a bracelet and a necklace. The defendant then returned to his apartment.

Adorjan further testified that Assistant State's Attorney Michael Laird arrived at the station at about 3 or 3:30 p.m. Laird talked to the defendant for about 15 or 20 minutes, and the defendant agreed to give a written statement.

The transcript of the statement given by the defendant was read to the jury by Assistant State's Attorney Laird. In addition to the information previously disclosed to Adorjan, the defendant also told Laird that Hall had threatened to kill him if he did not go with Hall to Robbins' apartment.

At the close of the trial, the jury found the defendant guilty of all counts.

I

The first issue raised on appeal is whether the trial judge improperly denied defendant's motion to quash his arrest and suppress evidence resulting from that arrest. The defendant contends that Beverly Truitt's jewelry and his statements to the police and the Assistant State's Attorney were obtained as a result of a custodial interrogation conducted without probable cause in violation of *Dunaway v. New York* (1979), 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248. *Dunaway* held that a detention for custodial interrogation without probable cause for arrest is violative of the fourth amendment safeguards against illegal arrests. In *Dunaway* the defendant was taken from a neighbor's home to the police station and interrogated. Although the defendant was not told he was under arrest, there was evidence that he was taken involuntarily and would have been arrested if he was uncooperative.

Illinois courts have followed *Dunaway* when they have determined that, under the totality of the circumstances, a defendant was taken into custody despite a disclaimer by the police of any intention to arrest. (See *People v. McMahon* (1980), 83 Ill. App. 3d 137, 403 N.E.2d 781; *People v. Dowdell* (1980), 81 Ill. App. 3d 266, 401 N.E.2d 295, *cert. denied* (1980), 449 U.S. 974, 66 L. Ed. 2d 236, 101 S. Ct. 385.) In reliance on these cases, the defendant contends that he was subjected to an unlawful custodial interrogation when the police transported him to the station without telling him that he did not have to go, gave him *Miranda* warnings at the station, and interrogated him for about four hours without telling him he was free to leave.

The Supreme Court of Illinois has held that not every stationhouse interrogation is necessarily so custodial as to indicate an arrest. (*People v.*

*Wipfler* (1977), 68 Ill. 2d 158, 368 N.E.2d 870.) Similarly, *People v. Miller* (1980), 89 Ill. App. 3d 973, 412 N.E.2d 175, stated that police may question citizens during criminal investigations and citizens have a duty to cooperate, regardless of where the questioning occurs, provided the citizens have not been restrained. *Miller* held that a citizen is restrained when, considering all of the circumstances, a reasonable man, innocent of any crime, would have considered himself under arrest. Applying this test, the *Miller* court distinguished *Dunaway* and held that the defendant was not illegally seized or arrested when he was asked to accompany the police officers to the station and he agreed to do so. Although the defendant testified that he believed he was under arrest when he was taken to the station, the court held that his subjective knowledge and fears were irrelevant.

■■ In the instant case, the defendant testified that he went involuntarily to the station because he was told to go and had no other choice. While we question the credibility of the defendant's conflicting testimony, we note that in accordance with *Miller* the subjective beliefs of the defendant are irrelevant to a determination of whether the defendant was taken into custody and unlawfully restrained. As in *Miller*, the defendant was not handcuffed, the officers did not display firearms, and the defendant was not told he was under arrest. Additionally, the testimony of Marie Brown and officers Adorjan, O'Connor and Zuley was that the officers asked the defendant to come to the station and that he agreed to do so. Investigator O'Connor testified that the defendant said he would be glad to go with the officers. No force was applied against the defendant and, in fact, the officers appeared to have been accommodating since they granted Brown's request to accompany the defendant. While the defendant was given *Miranda* warnings at the station, this fact does not require a determination that the defendant was taken into custody or placed under arrest. (*People v. Wipfler*; but see *People v. Dowdell*.) The defendant was not questioned continuously (*cf. People v. Sturdivant* (1981), 99 Ill. App. 3d 370, 425 N.E.2d 1046, and *People v. Townes* (1981), 94 Ill. App. 3d 850, 419 N.E.2d 604 (defendants involuntarily restrained when questioned intermittently at police stations for 9 and 12 hours respectively)) and was not considered by the police to be in custody until he was unable to explain the origin of the jewelry he was wearing. We believe that the custodial detention at this time was proper. Under the totality of circumstances as they existed in this case, we cannot say that a reasonable man in the defendant's position would have considered himself in police custody or under arrest when he accompanied the police to the station and remained there for questioning. Therefore, the evidence that resulted from this questioning was not obtained in violation of the fourth amend-

ment, and the trial court properly denied defendant's motion to quash his arrest and suppress evidence.

The defendant alternatively argues that his trial counsel was incompetent because he did not question the defendant and Investigator O'Connor during the hearing on the motion to quash defendant's arrest. However, since that testimony was elicited by defense counsel during the hearing on the defendant's second pretrial motion, and since we have considered that evidence in determining that the defendant's motion to quash his arrest was properly denied (see *People v. Braden* (1966), 34 Ill. 2d 516, 216 N.E.2d 808; *People v. Billings* (1977), 52 Ill. App. 3d 414, 367 N.E.2d 337), the merits of this argument need not be discussed.

## II

The second issue raised on appeal is whether the trial court erred in refusing the compulsion instruction tendered by the defense. The defendant contends that the instruction should have been given with regard to the Robbins' murder because the defendant's statement, which was admitted into evidence, disclosed that the defendant participated in that murder under threat that Lonnie Hall would kill him if he did not go with Hall to Robbins' apartment.

The affirmative defense of compulsion is codified in section 7—11 of the Criminal Code of 1961 (Criminal Code) (Ill. Rev. Stat. 1977, ch. 38, par. 7—11(a)). The statute provides:

> "A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct."

The State argued at trial, and the trial court agreed, that the defendant was not entitled to the compulsion instruction because he committed an offense punishable by death—the commission of two murders (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b)(3)). This position was recently adopted by the Illinois Supreme Court in *People v. Gleckler* (1980), 82 Ill. 2d 145, 411 N.E.2d 849. Although *Gleckler* held that the legislature intended to preclude the defense of compulsion for any murder offense, in light of due process problems, the court had to determine whether the defendant in that case had adequate notice of this intention. Since the defendant committed two murders, the court found that the defendant had adequate notice that compulsion was unavailable as a defense because he committed a crime that could require the sanction of death. Therefore, in accordance with *Gleckler*, before we can conclude that in the instant case

the compulsion instruction was properly denied, we must first determine whether the defendant committed an offense punishable by death.

According to section 9—1(b)(3) of the Criminal Code, a person found guilty of murder may be sentenced to death if he is convicted of murdering two or more persons regardless of whether the deaths occur as a result of the same act or of several related or unrelated acts so long as the deaths were the result of either an intent to kill more than one person or of separate premeditated acts. In the instant case, the defendant was convicted of murdering Robbins and Truitt based on the accountability theory. Thus, his guilt did not depend upon proof that he had the specific intent to commit murder. See *People v. Morgan* (1976), 39 Ill. App. 3d 588, 350 N.E.2d 27, *aff'd* (1977), 67 Ill. 2d 1, 364 N.E.2d 56, *cert. denied* (1977), 434 U.S. 927, 54 L. Ed. 2d 287, 98 S. Ct. 411.

Accountability for murder can be established by proof that before or during the commission of that offense, with the intent to promote or facilitate it, the defendant aided and abetted or attempted to aid and abet in the murder. (*E.g., People v. Shaw* (1981), 98 Ill. App. 3d 682, 424 N.E.2d 834; *People v. Kirkpatrick* (1979), 70 Ill. App. 3d 166, 387 N.E.2d 1284; see Ill. Rev. Stat. 1977, ch. 38, par. 5—2(c).) The intent to promote or facilitate a crime can be shown by evidence that the defendant shared the criminal intent of the principal or by evidence that there was a community of unlawful purpose. (*People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150.) The latter is proved by evidence of prior deliberation to commit the offense or by the spontaneous and combined participation of a group in the perpetration of the offense. (*People v. Torres* (1981), 100 Ill. App. 3d 931, 427 N.E.2d 329.) One may aid or abet in the commission of a crime without actively participating in the overt act; and if the evidence shows he was present at the crime without disapproving or opposing it, this conduct can be considered by the trier of fact in concluding that the person assented to the criminal act, lent his countenance and approval, and was thereby aiding and abetting the crime. (*E.g., People v. Morgan* (1977), 67 Ill. 2d 1, 364 N.E.2d 56, *cert. denied* (1977), 434 U.S. 927, 54 L. Ed. 2d 287, 98 S. Ct. 411; *People v. Hill* (1968), 39 Ill. 2d 125, 233 N.E.2d 367, *cert. denied* (1968), 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2305.) The failure to report the offense is also relevant to establishing accountability. *People v. Torres.*

That the defendant was accountable for the Robbins' murder is not disputed. We believe that there also was sufficient evidence to find the defendant accountable for Truitt's murder. While it appears that Truitt's murder was a spontaneous reaction by Hall to Truitt's appearance after Robbins' murder, this fact is not a defense when the evidence indicates involvement by the defendant in that spontaneous act. (See *People v. Tyler* (1979), 78 Ill. 2d 193, 399 N.E.2d 975.) We believe the defendant

aided and abetted in Truitt's murder because he was present at the scene of the crime, having remained outside her apartment (see *People v. Tyler* (defendant considered to be present at rape although rape occurred in another room)), and did not oppose or disapprove of Hall's actions. Although he was free to do so, the defendant did not leave the area or seek aid from others (*People v. Gray*) and instead waited for Hall to return. Reed also lent his countenance to Hall's actions by asking for some of the jewelry taken from Truitt's apartment. He did not report the incident to the authorities.

■■ In view of the above evidence, we hold that the defendant was accountable for both murders and that he had the intent to promote and facilitate them. We further believe that this finding of intent satisfies the requirements of section 9—1(b)(3) of the Criminal Code; that, therefore, the defendant was convicted of an offense punishable by death; and that the compulsion instruction tendered by the defense was properly refused.

### III

The third issue raised by the defendant is whether he was accountable for the armed robbery of Beverly Truitt. The defendant contends that he did nothing to promote or facilitate the commission of that offense, that he had no idea it would occur and took no part in its planning.

■■ For the reasons we determined that the defendant was proved accountable for Truitt's murder, we also hold that he was proved accountable for the armed robbery. The defendant was present at the scene of the crime, did nothing to disassociate himself from that occurrence and asked for and received some of the jewelry taken in the robbery. See *People v. Clifford* (1976), 38 Ill. App. 3d 915, 349 N.E.2d 922 (involvement can be inferred from activities that occur after the offense, such as the possession of stolen property).

### IV

The final argument raised by the defendant is that the court erred in instructing the jury regarding the inference it could draw from the defendant's possession of recently stolen property. Over defense objection the following instruction was given:

> "If you find that the defendant had exclusive possession of recently stolen property, and there is no reasonable explanation of his possession, you may infer that the defendant obtained possession of the property by Armed Robbery."

This instruction was taken from instruction number 13.21 of the Illinois Pattern Jury Instructions, Criminal (1968), an instruction for the offense of theft. The defendant relies on *Barnes v. United States* (1973), 412 U.S.

837, 37 L. Ed. 2d 380, 93 S. Ct. 2357, and argues that the use of this instruction for the offense of armed robbery is violative of due process of law since armed robbery cannot be inferred from the fact of possession of stolen property.

The argument raised by the defendant in the instant appeal was addressed and rejected by this court in *People v. Hendricks* (1976), 41 Ill. App. 3d 178, 353 N.E.2d 177. *Hendricks* stated that the instruction in question had to be read with all other instructions given to the jury and that, taken as a whole, the instructions in that case adequately informed the jury of the elements of armed robbery.

■■ In the instant case, the jury did receive other instructions on the elements of armed robbery. As *Hendricks* remains the law in this State (see, *e.g., People v. Gaskins* (1980), 82 Ill. App. 3d 37, 402 N.E.2d 258; *People v. Johnson* (1979), 74 Ill. App. 3d 1037, 393 N.E.2d 40; *People v. Franklin* (1978), 64 Ill. App. 3d 400, 380 N.E.2d 1082; *People v. Duckins* (1978), 59 Ill. App. 3d 96, 375 N.E.2d 173), we apply it to the instant case and hold that error did not occur when the above-stated instruction was given to the jury.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

WHITE, P. J., and RIZZI, J., concur.