THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
SAMUEL CALVILLO, Defendant-Appellant.

First District (3rd Division)   No. 85—3512

Opinion filed May 18, 1988.

Paul P. Biebel, Jr., Public Defender, of Chicago (R. H. R. Silvertrust, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Kenneth T. McCurry, Anthony J. Carballo, and Catharine M. Forest, Assistant State's Attorneys, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Raul Robles, Jesus Carrenza and defendant, Samuel Calvillo, were indicted for the murder of Mario Arteaga in the circuit court of Cook County. The cause against Carrenza was severed and Robles and defendant waived a jury trial. After directing a verdict for Robles, the trial court convicted defendant and sentenced him to 20 years in the Illinois Department of Corrections.

John Bax was the only occurrence witness for the State. At approximately 1 a.m. on November 10, 1983, he left a friend's apartment at 3302 South Kenilworth in Berwyn, Illinois, and took the elevator to the first floor. There he encountered three men, one of whom he recognized as Mario Arteaga, a building resident. Arteaga was just inside the inner security door to the building and was holding it open while talking to two men on the other side of the door in the outer vestibule. One of the men, who was the taller of the two, was very close to the security door and the other was "back" in a small niche to the left of the door. While the lighting on both sides of the security door was dim, Bax was able to see the faces of all three men. As Bax stepped through the security entrance, Arteaga asked him if he would give the two men directions to 26th and Ashland. Bax agreed to do so and spoke to the taller of the two men face to face. After determining that there was a language barrier between himself and the taller man, Bax drew a diagram of directions to 26th and Ashland. While he did so, the second man remained in the niche to the left of the security door and behind Bax. When the two men still did not understand his directions, Bax told Arteaga to tell them that he was going to Chicago and would show them the way from his vehicle if they followed him. Bax spent a total of two or three minutes with the men. After waiting a few minutes for the two men in his vehicle, which was parked "[a]lmost across the street" from the building, Bax heard a door slam, a gunshot, screaming and a man yell for help. The two men he had seen in the vestibule then came out of the building, looked both ways down the street and walked south down Kenilworth.

On November 13, Bax went to the Berwyn police station and looked at a group of six photographs or "mugshots." Three of these

photographs were black and white, three were color, five were wallet size and the sixth, a color photograph of defendant, was twice as large as the others. Bax identified the defendant's photograph as the shorter of the two men in the vestibule on November 10. On November 16, Bax returned to the Berwyn police station to view a lineup and, out of the men in the lineup, identified defendant. Bax also identified Robles out of a lineup held at the Cook County jail on November 23.

On cross-examination by Robles' counsel, Bax denied that he had also tentatively identified Jesus Carrenza and Joacquin Gonzales out of the lineup of November 23. On cross-examination by defendant's counsel, Bax denied telling the Berwyn police on November 10 that his friend had not let him into her apartment that night and claimed he had been in the apartment for an hour before leaving. Bax admitted that he had much less contact with the shorter of the two men in the vestibule than he had with Arteaga and the taller man. Bax denied having described the two men in the vestibule with Arteaga as 5 feet 10 inches and 5 feet 6 inches in height and claimed he described them as approximately his height, 5 feet 11 inches, and shorter. Bax claimed that a composite sketch drawn with his assistance on November 10 was of the shorter of the two men in the vestibule with Arteaga but admitted that he had told the police at that time that he could only identify the taller of the two men if he saw him again. Bax further admitted that he did not tell the police that either man had a moustache, beard or facial hair and conceded that defendant had a moustache in the photograph which he identified and a moustache and goatee in the lineup out of which he identified defendant.

Mark Van Cura, an assistant State's Attorney at the time of the murder investigation, also testified for the State. He interviewed defendant on November 16 at the Berwyn police station. At that time, he asked defendant if he was familiar with the *Miranda* warnings and defendant responded, "Yes, I am." Van Cura then gave defendant a *Miranda* rights waiver form and asked defendant to read it back to him, which defendant did. Van Cura then read the *Miranda* warnings to defendant and asked him if he understood each one, to which defendant responded that he did. Van Cura then had Berwyn Detective Roger Montoro ask defendant to read the waiver form back in Spanish, which defendant did. Montoro then read the *Miranda* warnings to defendant in Spanish. Van Cura then asked defendant to sign the waiver form, which defendant did, and also asked whether defendant wanted to talk to Van Cura about the incident on November 10, to which defendant responded, "Yes, I do."

Defendant told Van Cura that on the evening of November 10 he had been drinking when he met a man named Jessie, who asked defendant to give him a ride in his car. When the two men got in defendant's car, Jessie displayed a .38 caliber blue-steel revolver with a wooden handle and told defendant that he wanted to kill someone. Defendant told Jessie, "I'll take you somewhere, but I don't want to do anything." The two men picked up a third man named Rudy, and the three drove to Connie's restaurant in Berwyn but did not go in. They then drove to Kenilworth and Windsor in Berwyn. While seated in defendant's car, they saw a man drive by whom defendant pointed out as Mario. Jessie and Rudy then got out of the car and walked toward an apartment building across the street, some distance from the car. Defendant did not see anyone enter the building but he heard a gunshot and then saw Jessie and Rudy run out of the building. Van Cura asked defendant if he knew who had shot Mario and defendant responded, "Don't tell Jessie what I saw. I was in the vestibule. Jessie shot Mario." At this point, defendant indicated that he did not want to talk further with Van Cura.

Berwyn Detective Roger Montoro also testified for the State. In the course of investigating Arteaga's murder, he learned that Arteaga had worked at Connie's restaurant in Berwyn. Montoro interviewed defendant on November 16, after his arrest, at the Berwyn police station before Van Cura's arrival. Montoro read the *Miranda* warnings to defendant at this time and defendant responded "yes" after each one. Defendant then stated that he knew Arteaga had been shot and that he had lived with him at one time at the apartment building at 3302 South Kenilworth. Defendant also stated that he had worked at Connie's restaurant in Berwyn. Defendant then gave Montoro the same account of the events surrounding Arteaga's murder as he later gave Van Cura. Montoro further testified that the "Jessie" and "Rudy" whom defendant had been with on November 10 were Jesus Carrenza and Raul Robles.

Montoro further stated that when he interviewed Robles on November 17, 1983, after his arrest, Robles stated that he had gone to the apartment building at 3302 South Kenilworth with Carrenza and that while they were talking with Arteaga, a white man had appeared and that Carrenza had done the shooting. After defendant's arrest on the 16th, he told Montoro that he did not do the shooting but he knew who did. Finally, Montoro claimed neither he nor Assistant State's Attorney Van Cura had a language problem with defendant.

Defendant testified, through an interpreter, on his own behalf to the following. He had gone for a ride in his car on the evening of No-

vember 9, 1983, when he met Jesus Carrenza, with whom he was previously acquainted and who invited him to go for a beer. After they had gone to a bar, Robles arrived and played pool with defendant and Carrenza. Carrenza asked defendant if he would give him a ride and told defendant he would tell him where he wanted to go later. Defendant agreed and the three men left the bar about 90 minutes later. Defendant asked Carrenza where he was going and Carrenza told him "on the other side of Cicero" and then started laughing. When defendant asked why he was laughing, Carrenza told him because he was going to see a friend and kill him but did not tell defendant the friend's name. Defendant asked Carrenza if he was serious and Carrenza said yes. Defendant then told Carrenza he could not take him and Carrenza said that he had to take him and that, if he did not, he would blow defendant's brains out. Carrenza then showed defendant a gun and defendant told him he could take his car. Carrenza refused, stating that defendant had to be the driver and that he, Carrenza, was not stupid. Defendant then agreed to take Carrenza. After driving to Robles' home for a jacket for Robles, defendant drove the car where Carrenza told him to go and then parked it. Carrenza, who had the gun he displayed earlier, and Robles then left the car and walked toward a building. Defendant attempted to start his car to leave but it failed to start and he had to walk home.

The next day, defendant met Carrenza on the street and asked him to go with him to get his car because defendant was not sure where it was. After going for Robles and while en route to his car, defendant asked Carrenza what had happened. Carrenza eventually told defendant he had killed a friend. When defendant asked him why, Carrenza said it was none of his business. Carrenza then warned defendant not to tell anyone or the same thing would happen to him and especially to Robles.

Defendant denied that after his arrest Detective Montoro spoke to him in Spanish and claimed that at that time he did not understand English except for a few words. The next day, the officers questioned defendant in English and, as far as he understood by their hand gestures, asked him about someone's death, the driving of a car, whether defendant killed "him" and whether he knew anything about a gun, to which defendant responded negatively. Defendant also told the police that Jessie had shot Arteaga. Defendant denied that he had gone into the apartment building or that he had planned to kill Arteaga. Defendant further stated that he had not understood the questions put to him by Assistant State's Attorney Van Cura. He also testified that when he signed the *Miranda* warnings waiver form it was blank.

Finally, defendant testified that he did not know who Carrenza was going to see and that he drove Carrenza because he was afraid that Carrenza would blow his brains out as he had threatened to do.

OPINION

■ Defendant first contends he was not proved guilty beyond a reasonable doubt for several reasons. Preliminarily, we note that defendant admitted at trial that he drove Carrenza and Robles to Berwyn after Carrenza informed him that he wanted to see and kill a friend. As such, we need only address defendant's arguments that the State failed to prove that he intended to kill Arteaga or that he aided or abetted or otherwise helped Arteaga's murderer, *i.e.*, that he was guilty of Arteaga's murder on a theory of accountability, and that the State did not rebut his affirmative defense of compulsion.

Defendant concedes the State's theory of guilt was that he was accountable for the actions of the person who actually shot Arteaga whether he was present in the vestibule or remained, as he contended at trial, in his car during the shooting. He argues, however, that, assuming he was not present in the vestibule and even assuming that he was not acting out of compulsion and knew that Carrenza was going to kill someone, his act of driving Carrenza to the apartment building was insufficient to prove that he wanted the person killed or was trying to help Carrenza achieve that end. Defendant asserts, as Van Cura allegedly testified, that he "persistently maintained" he never agreed to help Carrenza shoot Mario and that he did not take Carrenza where Carrenza wanted to go so that Carrenza could shoot someone.

To convict a defendant under the theory of legal accountability for the conduct of another, the State must prove beyond a reasonable doubt that he: (1) solicited, aided, abetted, agreed or attempted to aid, another person in the planning or commission of the offense; (2) did so either before or during the commission of the offense; and (3) did so with the concurrent, specific intent to promote or facilitate the commission of the offense. (*People v. Grice* (1980), 87 Ill. App. 3d 718, 724-25, 410 N.E.2d 209, *cert. denied* (1981), 450 U.S. 1003, 68 L. Ed. 2d 207, 101 S. Ct. 1714; see also Ill. Rev. Stat. 1981, ch. 38, par. 5—2.) In short, evidence of conduct showing a design to aid in a crime will render a defendant accountable for the perpetrator's actions. *People v. Rodgers* (1978), 58 Ill. App. 3d 719, 722, 374 N.E.2d 721.

The record, in this case, reveals a chronology of events which strongly supports, beyond a reasonable doubt, the trial court's finding that defendant's acts contributed to Arteaga's death.

Defendant agreed to drive Carrenza and Robles, even accommodating them so far as to drive Robles home for a jacket before they went to find the victim. Van Cura testified that defendant told him that Carrenza asked for a ride; that Carrenza showed him a gun after getting into the car; that Carrenza said "I want to kill somebody"; and that defendant replied, "I'll take you somewhere, but I don't want to do anything." They drove to pick up Robles' jacket, then drove to a restaurant, and finally drove to Arteaga's block and parked the car. Defendant cannot be characterized as an innocent spectator to the criminal conduct of his companions. Common sense dictates that Carrenza would not have brought defendant along unless he was to be of some assistance. (See *People v. Bell* (1983), 113 Ill. App. 3d 588, 447 N.E.2d 909.) When he drove the others to the murder scene, defendant facilitated the offense and thereby increased the strong probability of the victim's death or great bodily harm. See *People v. Bell*, 113 Ill. App. 3d 588, 447 N.E.2d 909.

In addition, the trier of fact could find defendant assisted Carrenza by identifying the victim for him. Several months earlier, defendant had lived with Arteaga in the building where he was shot, and he had also previously worked with Arteaga at a restaurant. Defendant admitted pointing out Arteaga to Carrenza after Carrenza announced his plan to commit murder, after he drove to the scene of the murder, and after they awaited Arteaga's arrival.

Thus, defendant indicated a willingness to help further, if necessary, when he did not just stop the car briefly and let the two passengers out. Instead, defendant parked his car near Arteaga's building, turned off the engine, and waited. The mere intention to assist, if necessary, aids the perpetrator where he has knowledge of the accomplice's presence and intent to help. (*People v. Barnes* (1924), 311 Ill. 559, 143 N.E. 445.) Defendant's continued presence without opposition when he could have departed or sought aid from others tends to prove his accountability. (*People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979; *People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150, *cert. denied* (1981), 450 U.S. 1032, 68 L. Ed. 2d 228, 101 S. Ct. 1745.) Knowing Carrenza might kill the victim, defendant utterly failed to take any affirmative action to deprive his prior efforts of their effectiveness. See *People v. Tiller* (1982), 94 Ill. 2d 303, 447 N.E.2d 174, *cert. denied* (1983), 461 U.S. 944, 77 L. Ed. 2d 1302, 103 S. Ct. 2121.

In his statements made to Van Cura and Montoro, defendant said he remained outside, heard a gunshot and then saw Carrenza and Robles run out of the building. Defendant also stated, "I was in the ves-

tibule. [Carrenza] shot Mario." Given either version of these facts, along with defendant's other conduct, the trier of fact would be justified in concluding that defendant subscribed to an unlawful venture which fostered an atmosphere of violence and, as a natural consequence, resulted in the victim's death.

Evidence establishing that defendant maintained a close affiliation with his companions after the perpetration of the offense is a factor the court may consider in determining legal accountability. (*People v. Grice* (1980), 87 Ill. App. 3d 718, 410 N.E.2d 209.) The day after the murder, defendant met Carrenza. They went to Robles' house, and the three men went together to defendant's car. This conduct strongly supports a finding that defendant maintained a close affiliation with the codefendants. Additional evidence of defendant's accountability is found in defendant's failure to make any attempt, either before, during or after the murder, to report the crime. Failure to report an offense is relevant to establishing accountability for the offense. *People v. Reed* (1982), 104 Ill. App. 3d 331, 432 N.E.2d 979.

■ According to defendant's testimony, Carrenza never revealed the identity of his intended victim. The State need not prove that defendant intended to kill any particular person since there can be no question but that the natural tendency of Carrenza's conduct would be to destroy another's life. (See *People v. Gonzales* (1968), 40 Ill. 2d 233, 241-42, 239 N.E.2d 783.) Defendant's accountability requires the intent to facilitate the commission of the offense. (Ill. Rev. Stat. 1985, ch. 38, par. 5—2.) An "offense" means *any* offense. (*People v. Kessler* (1974), 57 Ill. 2d 493, 497-99, 315 N.E.2d 29, *cert. denied* (1974), 419 U.S. 1054, 42 L. Ed. 2d 650, 95 S. Ct. 635.) Thus, even if Carrenza intended to kill a different person, defendant would still be accountable for the unexpected shooting of Arteaga. Ignorance of what is going to happen does not preclude accountability. (*People v. Church* (1981), 102 Ill. App. 3d 155, 429 N.E.2d 577.) It is not necessary that defendant know with certainty that the intended crime will be successful or that his conduct will achieve certain results. See *People v. Bartall* (1983), 98 Ill. 2d 294, 456 N.E.2d 59.

■ Defendant also contends the State's failure to rebut his affirmative defense of compulsion raised a reasonable doubt of guilt.

Section 7—11(a) of the Criminal Code of 1961 provides:

"A person is not guilty of an offense, other than an offense punishable with death, by reason of conduct which he performs under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does

not perform such conduct." (Ill. Rev. Stat. 1981, ch. 38, par. 7—11.)

Compulsion is an affirmative defense of which the defendant must present "some evidence" to raise and which, if he does, the State must disprove beyond a reasonable doubt. (Ill. Rev. Stat. 1981, ch. 38, pars. 7—14, 3—2; *People v. Gleckler* (1980), 82 Ill. 2d 145, 155, 411 N.E.2d 849.) However, compulsion is not available as a defense to a charge of murder. (*Gleckler*, 82 Ill. 2d at 157.) As such, the State was not required to rebut defendant's evidence of compulsion to prove him guilty beyond a reasonable doubt.

■■■ Defendant next contends the trial court erred in denying a mistrial due to the State's failures to turn over during discovery the allegedly highly suggestive photographs comprising the photo array out of which Bax identified him and to inform the defense that it had dismissed a DUI charge against Bax in exchange for his testimony against defendant. Moreover, he contends the State's failure to reveal the dismissal of the DUI violated his right to confront the witnesses against him.

The record reveals that the photo array at issue was sufficiently identified in the police reports made available to the defense as part of the State's discovery answer. As defense counsel himself stated, "[o]ne of the police reports indicates photos were shown to [Bax]." Moreover, the police reports were not required to indicate of the photos shown to Bax "what kind" or "of what or whom they were." Rather, it was defense counsel's duty to investigate further to determine the nature of the photos once their existence was revealed to him. (See *People v. Son* (1982), 111 Ill. App. 3d 273, 278, 443 N.E.2d 1115 (it was defendant's obligation to pursue additional discovery or follow up on the State's discovery answer, which stated that all physical exhibits could be viewed by appointment and thus gave defendant a further opportunity to view photographs and composite drawings).) Here, the State's discovery answer stated, under "Identification Procedures," "See Police Reports, ***, all available upon receipt and request." Under "List of Physical Evidence that may be used at trial," the State answered, *inter alia*, "Photos" and indicated they would be made available for inspection at a reasonable time and date upon request.

Nor was the photo array shown to Bax unduly suggestive because half the photos were black and white, while half, including defendant's photo, were color photos, or because defendant's photo was twice as large as the other photos in the array. That a photo is in a format different from that of other photos in an array does not auto-

matically make it suggestive, especially where there is nothing to indicate that the identifying witness knew an arrest had been made at the time of the identification procedure or that the police had indicated in any way which was the defendant's photo. (*People v. Bryant* (1983), 94 Ill. 2d 514, 520, 447 N.E.2d 301.) Moreover, that a defendant's photo is larger than others in an array (*People v. Hart* (1973), 10 Ill. App. 3d 857, 295 N.E.2d 63) or the only color photo in an array (*People v. Hudson* (1972), 7 Ill. App. 3d 333, 287 N.E.2d 297) does not, alone, make the array impermissibly suggestive. While defendant's photo was approximately twice as large as the other five in the array, it was one of three in color. As such, that it was in color had no bearing on its suggestiveness and that it was twice as large as the others was, alone, inadequate to make it unduly suggestive.

The State's failure to disclose to defendant its voluntary dismissal of a DUI charge against Bax did constitute error. At the DUI hearing, the assistant State's Attorney unequivocally stated that the State was dropping the charge against Bax "in consideration" for his testimony in a murder case. Moreover, defendant had requested disclosure of the nature and outcome of any civil or criminal action pending against any State's witness at the time of his discovery request or during his prosecution. Finally, defendant also requested an order under Supreme Court Rule 415(b) (87 Ill. 2d R. 415(b)) that the State amend its discovery answer from time to time as required by new or modified information in its possession, knowledge or control. As such, the State was required to disclose its voluntary dismissal of the DUI charge against Bax.

However, where evidence favorable to a defendant but withheld by the State would not have created a reasonable doubt of guilt, the nondisclosure of that evidence is not reversible error. (*People v. Smrekar* (1979), 68 Ill. App. 3d 379, 385 N.E.2d 848.) Moreover, a constitutional violation occurs only where requested but suppressed evidence is favorable to the defendant and material to guilt or to punishment. Evidence is material in a constitutional sense when, viewed in the context of the entire record, it creates a reasonable doubt of guilt. (*People v. Williams* (1980), 91 Ill. App. 3d 631, 414 N.E.2d 1235.) The State's evidence was sufficient to prove defendant guilty beyond a reasonable doubt on a theory of accountability, whether he was present in the vestibule when Arteaga was shot or remained in his car, as he contended at trial. As such, the evidence suppressed by the State, which concerned the possible bias of an eyewitness to defendant's presence in the vestibule, was not material. It would not have created a reasonable doubt of defendant's guilt. Thus, the State com-

mitted no reversible error or constitutional violation by failing to disclose that information.

■ Defendant next contends the trial court erred in denying his motion for a new trial based on newly discovered evidence, *i.e.*, Raul Robles' testimony at Jesus Carrenza's trial that defendant was not present in the vestibule when Arteaga was shot.

Newly discovered evidence warranting a new trial must be such as, *inter alia*, was not discoverable or discovered prior to trial through the exercise of due diligence and is so conclusive as to probably change the result upon retrial. (*People v. Johnson* (1986), 148 Ill. App. 3d 163, 171-72, 498 N.E.2d 816.) Given the sufficiency of the evidence to prove defendant guilty even if he was not present in the vestibule, Robles' testimony at the Carrenza trial could not have changed the result. Moreover, the record clearly reveals that Robles' statement was discoverable and, in fact, discovered by defendant prior to trial. The State's answer to defendant's discovery request indicated that Robles had made an oral statement to the police and stated "See [police] reports" under "Substance." In addition, defense counsel's cross-examination of Detective Montoro clearly reveals that the defense knew the substance of Robles' statement, *i.e.*, that he and Carrenza were the two men in the vestibule when Arteaga was shot. As such, defendant's contentions to the contrary are meritless.

■ Defendant next contends the trial court erred in failing to suppress his out-of-court statements to the police. Defendant asserts he was advised of his *Miranda* rights only after being held in the police lockup overnight and being interrogated extensively by the police and Assistant State's Attorney Van Cura the next day. He also asserts that, because his understanding of English at the time of his arrest was minimal, he should have been advised of his rights in Spanish before any questioning, not after, as the record allegedly reflects.

A reviewing court cannot disturb a trial court's ruling on a motion to suppress unless it was manifestly erroneous. (*People v. Long* (1983), 99 Ill. 2d 219, 457 N.E.2d 1252.) In ruling on such a motion, it is the province of the trial court to determine the credibility of the witnesses and the weight to be given their testimony. (*People v. Patton* (1975), 33 Ill. App. 3d 923, 339 N.E.2d 22.) Moreover, in determining whether a defendant was advised of his *Miranda* rights and knowingly and intelligently waived them, a trial court need not be convinced beyond a reasonable doubt. *People v. Maxon* (1976), 35 Ill. App. 3d 670, 341 N.E.2d 479.

The testimony adduced at the suppression hearing and at trial was sufficient to support the conclusion that the police advised

defendant of his *Miranda* rights immediately after his arrest and before any questioning the next day. It was also sufficient to prove that defendant understood English well enough to have understood the *Miranda* admonitions by the various police officers and Assistant State's Attorney Van Cura, to have knowingly and intelligently waived his rights and to have understood the questions asked of him by the police and assistant State's Attorney. That the police and assistant State's Attorney advised defendant of his rights in Spanish as well as English does not manifestly reveal or require the conclusion that they knew he did not understand English and wanted to ensure the propriety of their interrogation after the fact. As such, the trial court's denial of the motion to suppress was not manifestly erroneous.

■ Defendant lastly contends he was deprived of his constitutional right to a jury trial because he did not knowingly and voluntarily waive that right.

A defendant knowingly and voluntarily waives his right to a jury trial where he signs a jury waiver in open court, the trial court asks him whether he understands he is giving up his right to have 12 men and women decide his guilt or innocence and he indicates that he understands and still wishes to waive that right. (See *People v. Guest* (1986), 115 Ill. 2d 72, 90, 503 N.E.2d 255, *cert. denied* (1987), ____ U.S. ____, 97 L. Ed. 2d 746, 107 S. Ct. 3241.) Immediately after defendant and his codefendant, Robles, executed jury trial waiver forms in open court and defense counsel tendered them to the trial court, the following occurred:

> "THE COURT: Would you please convey this information to the two defendants?
>
> Please tell them everyone charged with a crime is entitled to a jury. Tell them a jury is made up of 12 people and those people listen to other people who testify under oath during the trial, and the jury will decide whether or not they did something wrong, not the judge.
>
> Now, I have before me two documents *** entitled jury waiver. Does that have their signatures on these two documents?
>
> * * *
>
> [THE INTERPRETER]: Yes.
>
> THE COURT: Do they understand what has happened when they signed these two documents?
>
> [THE INTERPRETER]: Yes, we understand there will be no jury trial. We want to be judged by the bench.
>
> THE COURT: They both understand that?

[THE INTERPRETER]: Yes, your honor.
THE COURT: Do they want to ask any questions?
[THE INTERPRETER]: We want the trial to start."
The record thus clearly reveals the trial court zealously ensured that defendant knowingly and voluntarily waived his right to a jury trial and his contention otherwise is utterly meritless.

For all the foregoing reasons, the judgment of conviction entered by the circuit court of Cook County is affirmed.

Affirmed.

WHITE, P.J., and McNAMARA, J., concur.